Filed 6/1/17 (Reposted to correct counsel listing)

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　　　　　S224724
　　　　　　Plaintiff and Respondent,　)
　　　　　　　　　　　　　　　　　)　　　Ct.App. 5 F065984
　　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
RENE GUTIERREZ, JR.,　　　　　　)　　　　　Kern County
　　　　　　　　　　　　　　　　　)　Super. Ct. No. BF137853C
　　　　　　Defendant and Appellant.　)
　　　　　　　　　　　　　　　　　)
_____)

THE PEOPLE,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　　　　　S224724
　　　　　　Plaintiff and Respondent,　)
　　　　　　　　　　　　　　　　　)　　　Ct.App. 5 F065481
　　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
GABRIEL RAMOS,　　　　　　　　)　　　　　Kern County
　　　　　　　　　　　　　　　　　)　Super. Ct. No. BF137853A
　　　　　　Defendant and Appellant.　)
　　　　　　　　　　　　　　　　　)
_____)

THE PEOPLE,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　　　　　S240419
　　　　　　Plaintiff and Respondent,　)
　　　　　　　　　　　　　　　　　)　　　Ct.App. 5 F065288
　　　　　　v.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
RAMIRO ENRIQUEZ,　　　　　　　)　　　　　Kern County
　　　　　　　　　　　　　　　　　)　Super. Ct. No. BF137853B
　　　　　　Defendant and Appellant.　)
　　　　　　　　　　　　　　　　　)
_____)

SEE CONCURRING OPINION

Civil litigants and criminal defendants are guaranteed the right to trial by jury under the state and federal Constitutions. Because of this, California's system of justice depends on jurors. The mix of Californians who report for jury service across the state changes nearly every day, but the responsibility of courts to assure integrity in the selection of jurors does not. We have long held that discrimination in jury selection based on race, ethnicity, or similar grounds offends constitutional guarantees — and so has the United States Supreme Court. (*People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*).) It is not only litigants who are harmed when the right to trial by impartial jury is abridged. Taints of discriminatory bias in jury selection — actual or perceived — erode confidence in the adjudicative process, undermining the public's trust in courts. (*Miller-El v. Dretke* (2005) 545 U.S. 231, 238; *Powers v. Ohio* (1991) 499 U.S. 400, 412.)

During jury selection proceedings at trial, defendants Rene Gutierrez, Jr., Gabriel Ramos, and Ramiro Enriquez (collectively, defendants) joined in a *Batson*/*Wheeler* motion, contending that the prosecutor had improperly excluded prospective jurors on account of Hispanic ethnicity, after the prosecutor exercised 10 of 16 peremptory challenges to remove Hispanic individuals from the jury panel. The trial court found that defendants had established a prima facie case, but denied defendants' motion after finding the prosecutor's reasons to be neutral and nonpretextual. The Court of Appeal affirmed defendants' convictions in all respects.

This case offers us an opportunity to clarify the constitutionally required duties of California lawyers, trial judges, and appellate judges when a party has raised a claim of discriminatory bias in jury selection. What we conclude is that the record here does not sufficiently support the trial court's denial of the *Batson*/*Wheeler* motion with respect to one prospective juror. The error is

2

structural, damaging the integrity of the tribunal itself. In addition, the Court of Appeal erred in refusing to conduct comparative juror analysis. Defendants' resulting convictions must be reversed.

## I. BACKGROUND

### A. Overview

Around midnight on July 30, 2011, defendant Ramos became involved in an altercation with Clarence Langston in the parking lot of the Western Nights Motel in Bakersfield. Ramos asked defendants Gutierrez and Enriquez, who had been observing from a balcony, to come down. Ramos said he was going to retrieve a gun to defend himself, and he left the motel on foot. Langston rode away on his bicycle.

Gabriel Trevino testified that after Ramos and Langston left the motel premises, he, along with Enriquez and Gutierrez, got into an SUV driven by Kyle Fuller. At a stop sign, Enriquez said, "Look, there he is, there he is," identifying Langston. Gutierrez exited the vehicle, brandished his firearm, and fired three rounds. Langston was hit with multiple shotgun pellets and suffered nonfatal wounds to his upper body.

The prosecution's gang expert testified that defendants were Sureño gang members, and that the shooting was gang-related. According to the expert, Ramos was a member of the Varrio Bakers, a Sureño gang subset based in Bakersfield. Gutierrez and Enriquez, according to the expert, were members of Varrio West Side Shafter, a different Sureño gang subset based in Shafter. And Trevino testified that he himself was member of Varrio Wasco Rifas, a Sureño gang subset based in Wasco.

3

On June 6, 2012, a jury convicted Gutierrez and Enriquez of attempted premeditated murder (Pen. Code, §§ 664 & 187, subd. (a));[1] assault with a firearm (§ 245, subd. (a)(2)); and active participation in a criminal street gang (§ 186.22, subd. (a)). As to those two defendants, the jury found applicable a firearm enhancement (§ 12022.53, subds. (d) & (e)(1)) as to attempted premeditated murder, and a gang enhancement (§ 186.22, subd. (b)(1)) as to attempted premeditated murder and assault with a firearm. The jury deadlocked in deciding whether Ramos committed attempted premeditated murder and assault with a firearm, so the court declared a mistrial as to those counts. Ramos was found guilty of active participation in a criminal street gang, and he thereafter pleaded no contest to making criminal threats and admitted prior convictions. Following a bifurcated court trial, the court found true the prior strike conviction allegations as to Enriquez and Gutierrez.

Gutierrez was sentenced to prison for 30 years to life, plus 27 years. Enriquez was sentenced to prison for 14 years to life, plus 25 years. Ramos was sentenced to prison for 5 years. The Court of Appeal consolidated the appeals for Gutierrez, Ramos, and Enriquez. It unanimously affirmed the judgments in all respects.

## B. *Batson*/*Wheeler* **Motion**

All three defendants are Hispanic, and they joined in a *Batson*/*Wheeler* motion toward the end of voir dire proceedings. The motion was brought on the basis of asserted discriminatory exclusion of Hispanic individuals. Although counsel for Gutierrez also commented that a disproportionate number of strikes had been against females, he did not do so until after the prosecutor tendered his

---

[1] All further unmarked statutory references are to the Penal Code.

neutral explanations for panelists identified as Hispanic. Even assuming that defendants properly made a motion challenging the prosecutor's exclusion of females, the issue is not preserved for appeal because counsel did not obtain a ruling from the trial court. The court did not determine whether defendants established a prima facie case based on gender discrimination. (See *People v. Lewis* (2008) 43 Cal.4th 415, 481–482 [it was "incumbent on counsel" to secure a trial court ruling on additional *Batson*/*Wheeler* grounds].)

By the time the motion was made, the People had exercised 16 peremptory strikes — 10 of them against individuals identified as Hispanic, either based on appearance or surname.[2] The court observed that four of the prosecutor's challenges against Hispanics were consecutive. There were two Hispanic prospective jurors seated on the panel at the time of the motion.

---

[2] The People remarked that one of the prospective jurors at issue, Prospective Juror No. 2647624, had white skin and red hair, and did not "appear to be Hispanic." The court noted that she had a Hispanic surname, and that "we're not in a position to determine whether she might be Hispanic." In response to the court's invitation, the prosecutor put on the record his neutral reasons for removing this prospective juror. In addition, the court commented that Prospective Juror No. 2732073 did not have a Hispanic surname, but discerned that she appeared to be Hispanic; the prosecutor tendered a neutral reason for striking this panelist.

We have held that Spanish surnames may identify Hispanic individuals, who are members of a cognizable class for purposes of *Batson*/*Wheeler* motions. (*People v. Trevino* (1985) 39 Cal.3d 667, 686, disapproved on other grounds by *People v. Johnson* (1989) 47 Cal.3d 1194.) "Where . . . no one knows at the time of challenge whether a particular individual who has a Spanish surname is Hispanic, a showing that jurors are being excluded on the basis of surname alone" may nonetheless constitute a prima facie case of impermissible strikes based on association with a cognizable group. (*Ibid.*) "Although the correlation between surname and group membership is not exact, such precision is unnecessary." (*Ibid.*)

The People do not dispute that the prosecutor's pattern of challenges showed "a disproportionate number of . . . peremptory challenges against Hispanics." After finding that defendants had established a prima facie case under the *Batson/Wheeler* framework, the court asked the prosecutor to explain the reasons for his challenges. The prosecutor did so for each removed Hispanic panelist. The court individually reviewed eight out of 10 proffered justifications. The court did not individually review the strikes of Prospective Jurors Nos. 2468219 and 2547226.[3] Thereafter, the court made a global finding that the prosecutor's strikes were neutral and nonpretextual. It also found that the prosecutor "paid the same attention to all the jurors in terms of questioning" and "asked appropriate questions" of all prospective jurors. The court denied defendants' motion.

Thereafter, the People struck three more panelists. Defendants individually exercised further peremptory challenges, with counsel for Gutierrez removing one prospective juror previously identified as Hispanic. The final jury included one Hispanic individual. After additional voir dire, two alternate jurors were selected. Defendants did not renew their *Batson/Wheeler* motion. We granted review on the limited issue of whether the Court of Appeal erred in upholding the trial court's denial of defendants' joint *Batson/Wheeler* motion.[4]

---

[3]    In the record, the names of all panel members were redacted and replaced with seven-digit identifying numbers.

[4]    Defendants' cases came before this court as a single cause denominated *People v. Enriquez, et al.*, S224724. Defendants submitted separate briefing and each joined in the others' arguments. Prior to oral argument, the court ordered *People v. Enriquez* (F065288) severed and redocketed as S240419, due to circumstances reflected in the docket. The other two matters — *People v. Gutierrez* (F065984) and *People v. Ramos* (F065481) — were captioned *People v. Gutierrez, et al.* and proceeded as a single cause, S224724, to oral argument. Counsel for Enriquez subsequently requested that *People v. Enriquez* be

*(footnote continued on next page)*

## II. DISCUSSION

### A. Legal Standard

Peremptory challenges are a longstanding feature of civil and criminal adjudication. But the exercise of even a single peremptory challenge solely on the basis of race or ethnicity offends the guarantee of equal protection of the laws under the Fourteenth Amendment to the federal Constitution. (*Batson*, *supra*, 476 U.S. 79; *United States v. Martinez-Salazar* (2000) 528 U.S. 304, 315.) Such conduct also violates a defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the state Constitution. (*Wheeler*, *supra*, 22 Cal.3d 258, 276–277.)

At issue in a *Batson/Wheeler* motion is whether any specific prospective juror is challenged on account of bias against an identifiable group distinguished on racial, religious, ethnic, or similar grounds. (*People v. Avila* (2006) 38 Cal.4th 491, 549 (*Avila*).) Exclusion of even one prospective juror for reasons impermissible under *Batson* and *Wheeler* constitutes structural error, requiring reversal. (*People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*).)

When a party raises a claim that an opponent has improperly discriminated in the exercise of peremptory challenges, the court and counsel must follow a three-step process. First, the *Batson*/*Wheeler* movant must demonstrate a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. The moving party satisfies this first step by

*(footnote continued from previous page)*

consolidated with *People v. Gutierrez, et al.* for purpose of opinion. Both counsel in *People v. Enriquez* waived oral argument and agreed to submit on the briefs. The court granted the unopposed request to consolidate. Accordingly, in this opinion, we resolve the matters of all three defendants.

producing " 'evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred.' " (*Avila*, *supra*, 38 Cal.4th at p. 553, quoting *Johnson v. California* (2005) 545 U.S. 162, 170.)

Second, if the court finds the movant meets the threshold for demonstrating a prima facie case, the burden shifts to the opponent of the motion to give an adequate nondiscriminatory explanation for the challenges. To meet the second step's requirement, the opponent of the motion must provide "a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." (*Batson*, *supra*, 476 U.S. at p. 98, fn. 20.) In evaluating a trial court's finding that a party has offered a neutral basis — one not based on race, ethnicity, or similar grounds — for subjecting particular prospective jurors to peremptory challenge, we are mindful that " '[u]nless a discriminatory intent is inherent in the prosecutor's explanation,' " the reason will be deemed neutral. (*Purkett v. Elem* (1995) 514 U.S. 765, 768 (per curiam) (*Purkett*).)

Third, if the opponent indeed tenders a neutral explanation, the trial court must decide whether the movant has proven purposeful discrimination. (See *Johnson v. California* (2005) 545 U.S. 162, 168.) In order to prevail, the movant must show it was " 'more likely than not that the challenge was improperly motivated.' " (*People v. Mai* (2013) 57 Cal.4th 986, 1059.) This portion of the *Batson/Wheeler* inquiry focuses on the subjective genuineness of the reason, not the objective reasonableness. (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.) At this third step, the credibility of the explanation becomes pertinent. To assess credibility, the court may consider, " 'among other factors, the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy.' " (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*), quoting *Miller-El v. Cockrell* (2003) 537 U.S. 322, 339 (*Miller-El I*).) To satisfy herself that an explanation is

8

genuine, the presiding judge must make "a sincere and reasoned attempt" to evaluate the prosecutor's justification, with consideration of the circumstances of the case known at that time, her knowledge of trial techniques, and her observations of the prosecutor's examination of panelists and exercise of for-cause and peremptory challenges. (*People v. Hall* (1983) 35 Cal.3d 161, 167–168 (*Hall*).) Justifications that are "implausible or fantastic . . . may (and probably will) be found to be pretexts for purposeful discrimination." (*Purkett*, *supra*, 514 U.S. at p. 768.) We recognize that the trial court enjoys a relative advantage vis-à-vis reviewing courts, for it draws on its contemporaneous observations when assessing a prosecutor's credibility. (See *Lenix*, at p. 613.)

We review a trial court's determination regarding the sufficiency of tendered justifications with " 'great restraint.' " (See *People v. Ervin* (2000) 22 Cal.4th 48.) We presume an advocate's use of peremptory challenges occurs in a constitutional manner. (See *People v. Fuentes* (1991) 54 Cal.3d 707, 721 (conc. opn. of Mosk, J.).) When a reviewing court addresses the trial court's ruling on a *Batson*/*Wheeler* motion, it ordinarily reviews the issue for substantial evidence. (*People v. McDermott* (2002) 28 Cal.4th 946, 970.) A trial court's conclusions are entitled to deference only when the court made a "sincere and reasoned effort to evaluate the nondiscriminatory justifications offered." (*People v. Burgener* (2003) 29 Cal.4th 833, 864.) What courts should not do is substitute their own reasoning for the rationale given by the prosecutor, even if they can imagine a valid reason that would not be shown to be pretextual. "[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. . . . If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." (See *Miller-El v. Dretke* (2005) 545 U.S. 231, 252 (*Miller-El II*).)

9

**B. Overview of Strikes**

The prosecutor provided justifications for strikes of 10 Hispanic individuals. As to four of these prospective jurors — Prospective Jurors Nos. 2647624, 2408196, 2732073, and 2632053 — the prosecutor cited as at least one reason the fact that they were each either previously affiliated with gangs or had family members who were at some point involved in gang activity. The prosecutor struck Prospective Jurors Nos. 2852410 and 2291529 because they recounted negative experiences with law enforcement. Prospective Juror No. 2468219 (Juror 2468219) was removed because she testified about "living in an area with a lot of gang activity, but that she had not specifically seen," her brother had been accused of a crime, and she previously served as a juror in a criminal case that resulted in a hung jury. Below we describe in more depth the circumstances surrounding the strikes of the remaining three Hispanic panelists who were the subject of defendants' *Batson/Wheeler* motion.

*1. Prospective Juror No. 2723471*

A teacher from the City of Wasco, Prospective Juror No. 2723471 (Juror 2723471) was divorced and without children. Her former husband was a correctional officer. She had other relatives in law enforcement positions, including an uncle who worked for California Highway Patrol. Neither she nor anyone close to her had any connections to gangs.

The prosecutor's colloquy with Juror 2723471, in its entirety, was as follows:

"[The prosecutor]: And starting with Ms. 2723471, are you gangs [*sic*] that are active in the Wasco area?

"[Juror 2723471]: No.

"[The prosecutor]: Do you live in the Wasco area?

"[Juror 2723471]: Yes.

10

"[The prosecutor]: In Wasco itself?

"[Juror 2723471]: Yes, I live in Wasco."

The prosecutor indicated that his decision to challenge Juror 2723471 was "a tough one." The reason for the strike, he said, was that "[s]he's from Wasco and she said that she's not aware of any gang activity going on in Wasco, and I was unsatisfied by some of her other answers as to how she would respond when she hears that Gabriel Trevino is from a criminal street gang, a subset of the Surenos out of Wasco." The prosecutor did not specify which of her "other answers" caused him dissatisfaction, nor do the People identify any such responses bearing on her possible reaction to Trevino's testimony. We have found no other answers in the record to support the People's position on this point.

The prosecutor had broached the Wasco-related justification a few minutes earlier, during his explanation of his strike of a different Hispanic female, Prospective Juror No. 2408196 (Juror 2408196). He said that that panelist's unawareness of Wasco gang activity "causes a moment of pause when she's going to hear . . . Mr. Trevino freely admits that he's a member of the Varrio Wasco." But the prosecutor struck Juror 2408196 because she also had an uncle who was in a gang and had a cousin who had been murdered.[5]

---

[5] The prosecutor articulated multiple reasons for striking Juror 2408196: "Ms. 2408196 has also an uncle who is in a gang, and she lives in Wasco. This is important, Your Honor, Gabriel Trevino is going to testify under the immunity agreement in this case. And, although, he is a Sureno like the three defendants or at least the People's evidence wouldn't [sic] show that. [¶] He is specifically a member of the Varrio Wasco Rifas. And I think that Ms. 2408196 in addition to saying that her uncle was in a gang, she also indicated that she was unaware of any gang activity in Wasco which is -- causes a moment of pause when she's going to hear -- if she left [sic] on this jury, Mr. Trevino freely admits that he's a member of the Varrio Wasco. And she also had a cousin murder [sic] in 2004. And for those reasons, the People issued the peremptory challenge."

11

Regarding Juror 2723471, the court stated: "I checked again, and [the prosecutor] did pass several times with Ms. 2723471 still on the panel." The court noted that "Ms. 2723471 was excused as a result of the Wasco issue and also lack of life experience." Defendants argue, and the People concede, that the court was partially mistaken: the prosecutor had not enumerated lack of life experience as a reason for striking Juror 2723471. Accordingly, the sole basis relied upon by the prosecutor for striking this particular panelist was the "Wasco issue."

### 2. *Prospective Juror No. 2547226*

Prospective Juror No. 2547226 (Juror 2547226) lived in southwest Bakersfield and worked as a service coordinator for mentally disabled individuals. She had two children, and her significant other was a self-employed truck driver. She had been selected to serve on a jury a couple years earlier, but parties reached a plea agreement. She had no gang experience, nor any close relations with gang members.

The prosecutor asked this prospective juror several questions about the jury deliberation process and her understanding of a juror's role. Their exchange included the following excerpt:

"[The prosecutor]: And that's sort of the functions of these deliberations. You talk to each other, and you hear what people hear about the evidence, and you see where everyone is, and then ultimately you try to reach a verdict as best you can, do you understand that?

"[Juror 2547226]: Yes.

"[The prosecutor]: As one of 12 jurors, you would have a vote, do you understand that?

"[Juror 2547226]: Yes.

"[The prosecutor]: Okay. You also understand that your vote is yours, you have a duty to listen to and talk to other jurors, but how you vote if you're

12

impaneled on this jury is yours, it's your responsibility, and it's what you believe the law that the judge gives you and the facts and the evidence that you heard in court indicated as the truth, do you understand that?

"[Juror 2547226]: Yes.

"[The prosecutor]: Would you be able to do that? Would you be able to participate in deliberations and listen to everyone else in speaking your mind?

"[Juror 2547226]: Yes.

"[The prosecutor]: You don't think that there's anything about you that's differential [*sic*] or, you know, want to sit in the background or listen to other people?

"[Juror 2547226]: No, I don't think so.

"[The prosecutor]: Okay. You have no problem with speaking your mind and listening to other people at the same time?

"[Juror 2547226]: I think I do better at listening than speaking my mind out.

"[The prosecutor]: What happens if you don't agree?

"[Juror 2547226]: Then the vote is mine. So I just -- what I'm not in agreement with and decide what I want to say.

"[The prosecutor]: Would you have any problem letting other people on the panel know that you don't agree and here's why?

"[Juror 2547226]: I don't think so."

At first, the prosecutor could not recall why he struck this panelist. Later, consulting a single note, he stated, "I believe I asked her about 12 votes, each independent of the others and her being able to, you know, take on the task which is obviously the difficult task of any juror of both standing their own ground where they believe they are right, and also listening to other people. And I was concerned about her articulation about that role. I was concerned about her

13

understanding of that and her ability to -- quite frankly if she felt strongly to be heard in the course of jury deliberations."

The trial court did not make any individualized finding with respect to the removal of this prospective juror. In upholding this strike on direct appeal, the Court of Appeal explained, "When questioned during voir dire, Juror 2547226 indicated she was better at 'listening than speaking my mind' and expressed that she did not know how many jurors had to agree to a verdict in a criminal case. [¶] . . . Juror 2547226 gave equivocal answers to some questions and expressed a lack of understanding of the jury process in a criminal case. The prosecutor's stated reasons reflect that, based upon Juror 2547226's equivocal answers to voir dire questions, he had doubts about her being able to engage fully in the deliberative process and fulfill her role as a juror." We note that the prosecutor did not cite as a reason for striking Juror 2547226 her unawareness of the necessary unanimity of a verdict.

When the prosecutor asked Juror 2547226, "Would you be able to participate in deliberations and listen to everyone else in speaking your mind?" she answered, unequivocally, "Yes." Yet the prosecutor continued to probe her on this point, asking whether she considered herself deferential or prone to "sit in the background."

The prosecutor did not cite Juror 2547226's demeanor as a reason for exercising a strike against her. The People argue that the precise phrasing of "I don't think so" in response to a question asking whether this panelist may wish to sit in the background and listen to other people "reasonably could make the prosecutor question her ability to deliberate and state her opinion to others when necessary." During the same panel round in which the prosecutor individually questioned Juror 2547226, the prosecutor engaged Prospective Juror No. 2570137

14

(Juror 2570137), a non-Hispanic female. The following colloquy transpired between the prosecutor and Juror 2570137:

"[The prosecutor]: And, Ms. 2570137, I asked the other potential jurors if you are impaneled on this jury you're going to be in deliberation with 11 other people, they are going to want and need your input, and you are very soft spoken, would you be able to speak your mind?

"[Juror 2570137]: I hope so.

"[The prosecutor]: Would you be able to listen to other people as well?

"[Juror 2570137]: Yes, definitely that if I can hear them.

"[The prosecutor]: Thank you, Ms. 2570137."

As the record demonstrates, the prosecutor perceived Juror 2570137 to be soft-spoken. Despite her arguably noncommittal answer of "I hope so" in response to the prosecutor's inquiry as to whether she could speak her mind during jury deliberations, the prosecutor did not further press this panelist on her ability to voice her opinions, as he had done with Juror 2547226. Instead, he shortly thereafter thanked Juror 2570137 and moved on to question another prospective juror.

### 3. Prospective Juror No. 2510083

An elementary school instructional aide, Prospective Juror No. 2510083 (Juror 2510083) lived in southwest Bakersfield. She was unmarried and had no children. She had no prior jury experience. One of her cousins was in the California Highway Patrol and another cousin worked for the highway patrol in Arizona. A third cousin was a workers' compensation paralegal at a local law office.

During the first week of voir dire proceedings, Juror 2510083 informed the court of a potential hardship due to a job interview scheduled the morning of the upcoming Friday. The court advised her to request that the interview be

15

rescheduled to another time. The next day, Juror 2510083 reported that her interview had been rescheduled for 4:00 p.m. on Friday. In the presence of counsel, the court agreed to make arrangements so that she could attend her interview. She returned the following week for the continuation of voir dire.

When questioned by defense counsel, Juror 2510083 agreed that although people can be trained to make fewer mistakes, nobody is perfect and everyone is capable of making mistakes, even police officers. The prosecutor's individual voir dire of this panelist proceeded as follows:

"[The prosecutor]: You're an instructional aide at an elementary school; is that correct?

"[Juror 2510083]: Hmm-hmm.

"[The prosecutor]: Where generally is the elementary school?

"[Juror 2510083]: It's over close to where I live on the Southwest part of town.

"[The prosecutor]: Okay. And what age students do you usually deal with?

"[Juror 2510083]: They are fourth graders.

"[The prosecutor]: About 10 years old?

"[Juror 2510083]: Yeah, about nine, 10.

"[The prosecutor]: Have you held any work prior to that or is this full-time work?

"[Juror 2510083]: Before I started working there?

"[The prosecutor]: Yes.

"[Juror 2510083]: Yeah, I worked somewhere else full-time.

"[The prosecutor]: What was the name of that place?

"[Juror 2510083]: It was customer service.

"[The prosecutor]: Any type of business in particular or just --

"[Juror 2510083]: For that job?

16

"[The prosecutor]: Yes.

"[Juror 2510083]: It was a phone company.

"[The prosecutor]: Okay."

In explaining why he struck Juror 2510083, the prosecutor stated, "Ms. 2510083, like I was asking to Mr. 2868617 and Ms. 2478882, I was concerned about her life experience. She's an instructional aid[e] at an elementary school and she has no jury experience and she came across of being quite young. And, although, her youth is not a reason for exclusion, I thought there was a lack of sophistication in some of her answers. And, I believe, she had also asked for release due to a hardship because of her situation. [¶] . . . [I]t just didn't seem to me that she had -- again, she had the life experience necessary to consider some of the charges." The prosecutor acknowledged that this strike was a "tough call" because this panelist had relatives in law enforcement. In addition, the prosecutor regarded with favor the fact that she had a cousin working as a paralegal "so she had some idea of the nature and the purpose of these proceedings."

The prosecutor incorrectly stated that this panelist "had also asked for release due to a hardship because of her situation." Juror 2510083's potential job interview conflict was resolved, in the prosecutor's presence, during the first week of voir dire proceedings: she successfully rescheduled her interview and the court agreed to make accommodations so that she could attend. At no time did Juror 2510083 ask to be excused. In this respect, the Court of Appeal erroneously affirmed the trial court's ruling as to Juror 2510083 on the hardship ground alone. On review, the People contend — for the first time — that the prosecutor's proffered hardship reason was based on a mistake of fact. Voir dire lasted from Monday, May 7 through part of Wednesday, May 16. Along with the court, four attorneys — the prosecutor and the three defense attorneys — engaged in separate lines of questioning during the jury selection process. Several days, including an

17

intervening weekend, elapsed between the resolution of the panelist's potential interview conflict (on Thursday, May 10, the day before her interview) and the defendants' *Batson/Wheeler* motion (on Tuesday, May 15).  The People argue that the prosecutor made a genuine mistake regarding this point of hardship.

In individually reviewing the tendered rationale for striking Juror 2510083, the court remarked, "Another juror indicated he excused for the purposes of -- or excused as a result of primarily life experience, and I think it was Ms. 2510083, and both of those jurors are young.  The only juror similarly situated that -- obviously we still have -- we haven't finished the challenges, but Mr. 2861675 is young.  He's the only one that I find similarly situated perhaps to Ms. 2723471 and Ms. 2510083 in terms of perhaps having a lack of life experience, but there were other reasons as he gave to those jurors as well, not just the lack of life experience."

The prosecutor commented that this panelist's "youth [was] not a reason for exclusion."  It appears that the trial court found Juror 2510083 and Prospective Juror No. 2861675 (Juror 2861675) to be comparable in terms of relative youth and lack of life experience, such that the decision to strike one but not the other might require further examination — if those had been the only reasons proffered. But the court apparently found credible the prosecutor's "other reasons" for striking Juror 2510083, i.e., a request for release due to hardship and a lack of sophistication.  The court did not correct the prosecutor's erroneous assertion that this panelist asked to be excused due to a hardship.

### C.  Analysis

#### 1.  Claim of Error Regarding Prospective Juror No. 2723471

##### a.  Neutrality of Explanation

When they assess the viability of neutral reasons advanced to justify a peremptory challenge by a prosecutor, both a trial court and reviewing court must

18

examine only those reasons actually expressed. (*People v. Jones* (2011) 51 Cal.4th 346, 365 (*Jones*).) Defendants argue that the prosecutor's explanation regarding his removal of Juror 2723471 was inadequate because it did not explain why her unawareness of gang activity where she lived made her a bad or undesirable juror. But *Batson* and *Wheeler* do not prescribe such an exacting standard at the second step. We find the reason here to be "clear and reasonably specific," particularly considering that the prosecutor had previously, with respect to another prospective juror, introduced the notion of this Wasco-related rationale and provided somewhat more insight into the logic underlying it. (See *Jones*, at pp. 358, 367 [prosecutor's explanation that he was " 'troubled' " by potential juror's " 'body language and his response' " to questioning about being falsely accused held to be "clear and reasonably specific" even though prosecutor did not describe exactly what the body language was].)

Defendants also contend that the prosecutor's reasoning was not neutral, because he was effectively using an individual's residence in Wasco as a proxy for Hispanic ethnicity. According to 2010 census data, Wasco is a city of approximately 25,000 residents, 76.7% of whom identify as Hispanic or Latino. (See U.S. Census Bureau, Data for 2010 Census <http://www.census.gov/quickfacts/table/PST045215/0683542> [as of June 1, 2017].) Defendants cite *United States v. Bishop* (9th Cir. 1992) 959 F.2d 820 (*Bishop*) for the proposition that equal protection principles prohibit the utilization of residence as a surrogate for racial stereotypes during jury selection. In *Bishop*, the prosecutor explained that he felt an eligibility worker who lived in Compton was likely to be hostile to law enforcement and desensitized to violence. (See *id.* at p. 822.) The court found discriminatory intent to be inherent in these generic "group-based presuppositions" that "one who lives in an area heavily populated by poor black people could not fairly try a black defendant." (*Id.* at p. 825.)

19

The prosecutor's justification here is distinguishable from the justification at issue in *Bishop*. True: in some ways, the purported basis of unawareness of gang activity in one's neighborhood was particular to Wasco, a city whose population is mostly Hispanic or Latino. After all, the prosecutor did not exercise a strike, for example, against non-Hispanic Prospective Juror No. 2581907, a longtime resident of Tehachapi who was unaware of gang problems in his neighborhood.**6** But such a discrepancy is not altogether inconsistent, given the prosecutor's articulated basis referencing Trevino's Wasco gang affiliation. The reason was thus not inherently based on stereotypical views of Wasco residents.

We find the Wasco reason to be facially neutral. Our conclusion is compelled by the high court's decision in *Purkett*, which held that the second stage of the *Batson/Wheeler* framework "does not demand an explanation that is persuasive, or even plausible. ' . . . [T]he issue is the facial validity of the prosecutor's explanation.' " (*Purkett*, *supra*, 514 U.S. at p. 768.) Accordingly, we proceed to the third step of the *Batson/Wheeler* inquiry, in order to assess the credibility of the explanations provided. (*Lenix*, *supra*, 44 Cal.4th at p. 613.)

### b. Credibility of Explanation

At the third step of the *Batson/Wheeler* analysis, the trial court evaluates the credibility of the prosecutor's neutral explanation. Credibility may be gauged by examining factors including but not limited to " 'the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " (*Jones*, *supra*, 51 Cal.4th at p. 360.)

In evaluating the prosecutor's reasons, the court expressly acknowledged

---

**6**      This individual was ultimately seated on the jury.

the justification for striking Juror 2723471, noting that she "was excused as a result of the Wasco issue." It also observed that the prosecutor "did pass several times with Ms. 2723471 still on the panel." Moments later, in denying defendants' *Batson/Wheeler* motion as to all Hispanic panelists, the court made a global finding that "in looking at the totality of the circumstances and judging the reasons given by [the prosecutor], I don't find his reasons to be a pretext in this particular case, and he does appear consistent." The prosecutor cited the "Wasco reason" for challenging both Jurors 2723471 and 2408196, the only two panelists who were Wasco residents. This rationale nonetheless applied only to Hispanic panelists — so the notion that the prosecutor "consistently" cited this reason appears minimally probative on the issue of whether the reason offered by the prosecutor was credible. The court also made a general finding that the prosecutor had "paid the same attention to all the jurors in terms of questioning whether they are Hispanic or not Hispanic, and he's asked appropriate questions to all the jurors . . . ." Yet the prosecutor questioned only Hispanic panelists about gang activity in Wasco, because only Hispanic panelists stated that they lived in Wasco. No adequate comparison exists between Hispanic and non-Hispanic panelists regarding the prosecutor's questioning specifically about Wasco.

The prosecutor's articulated basis for striking Juror 2723471 was derived solely from three responses to yes/no questions, which established that this panelist lived in Wasco and was not aware of gangs active in the Wasco area. The prosecutor may have conveyed the gist of his concern — that he was uncertain how a prospective juror's unawareness of Wasco gang activity might bear on her response to Trevino — but his explanation left some lucidity to be desired. What the People argue on review is that Trevino was an "important witness" for the prosecution, and "[t]he prosecutor could have reasonably anticipated that Trevino would testify as to his own gang affiliation and criminal activity in Wasco." They

21

assert, "The fact that a potential juror is unaware of the activity of gangs in Wasco could cause that juror to be biased against Trevino who would testify to the contrary." In consideration of the record of voir dire, such a deduction is tenuous. It is not evident why a panelist's *unawareness* of gang activity in Wasco would indicate a bias against a member of a gang based in Wasco. Although it is possible that a juror unaware of gang activity in Wasco would be discomfited by, and skeptical of, a witness who claimed to be member of a gang based in her neighborhood, such a conclusion does not strike us as an obvious or natural inference drawn from this panelist's responses.

It is conceivable — even though the People do not present this argument — that the prosecutor genuinely believed gang activity to be so rampant in Wasco that this panelist must have been either untruthful or uninformed in denying her awareness of Wasco gang activity. If this had been the case, such reasoning should have been articulated by the prosecutor. "[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis." (See *Miller-El II, supra*, 545 U.S. at p. 252.)[7]

The questioning of Juror 2723471 provides little aid in elucidating the reasoning for this strike. The prosecutor asked no follow-up questions to this

---

[7]     Even if a prosecutor *had* justified this strike with the belief that a panelist's professed unawareness of gang activity indicated her dishonesty or ignorance, the basis for such a belief would compel further scrutiny. Insofar as a prosecutor's challenges might be guided by an ungrounded assumption that Hispanic or Latino residents of Wasco (a community that is predominantly Hispanic or Latino) *should* be aware of gang activity in their neighborhood, a court might query whether this reasoning is inherently neutral as to race or ethnicity. (See *Bishop*, *supra*, 959 F.2d at p. 827 [justification is not race-neutral when "tainted by impermissible generalizations regarding racial groups and their environment"].)

22

prospective juror, certainly none about how she would react if she heard that a member of a Wasco gang would testify in this case. No further support for the People's argument is found in this panelist's dialogue with either the court or any of the defense attorneys. The prosecutor's swift termination of individual voir dire of this panelist — even though her responses did not evince a manifest predisposition to disbelieve or dislike Trevino — at least raises a question as to how interested he was in meaningfully examining whether her unawareness of gang activity in Wasco might cause her to be biased against the witness for the People's case. (Cf. *Miller-El II*, *supra*, 545 U.S. at p. 246 ["[T]he prosecution asked nothing further about the influence his brother's history might have had on [the prospective juror], as it probably would have done if the family history had actually mattered. [Citation.] There is no good reason to doubt that the State's afterthought about [the prospective juror]'s brother was anything but makeweight."].)

In the course of responding to voir dire questioning by the court, Juror 2723471 disclosed that she had relatives in corrections and law enforcement positions. Her former husband was a correctional officer, and she had other relatives in law enforcement positions, including an uncle who worked for the California Highway Patrol. The record demonstrates that this prosecutor viewed familial relationships with law enforcement members as a generally desirable characteristic. The prosecutor explained that he considered his strikes of Jurors 2510083 and 2468219 to be a "tough call" because of their relatives in law enforcement. The prosecutor's statements, considered in context, reveal that he viewed familial ties to law enforcement as an offsetting force against characteristics he perceived as negative. The fact that the prosecutor struck Juror 2723471 despite her law enforcement ties — though he expressed his tendency to favor this characteristic with regard to other panelists — is a relevant circumstance

23

in assessing the credibility of the prosecutor's reasoning.  (See *Miller-El II*, *supra*, 545 U.S. at p. 247 [considering fact that challenged black panelist "should have been an ideal juror in the eyes of a prosecutor" when assessing credibility of prosecutor's reasons].)

Weighing against a finding of discriminatory intent, however, is the fact that the prosecutor passed on challenges five times while Juror 2723471 remained on the panel.  She lasted through one full panel round and was the first person struck during the next panel round.  These passes may tend to indicate the prosecutor's good faith.  (See *People v. Snow* (1987) 44 Cal.3d 216, 225.)  Indeed, we have found that passes while a specific panelist remains on the panel " 'strongly suggest[] that race was not a motive' " in challenged strikes.  (*People v. Lomax* (2010) 49 Cal.4th 530, 576; see *Lenix*, *supra*, 44 Cal.4th at p. 629.)  We bear in mind this circumstance, which the trial court recognized.  But neither that acknowledgement nor the prosecutor's passes themselves wholly preclude a finding that a panelist is struck on account of bias against an identifiable group, when such a strike occurs eventually instead of immediately.  (See *Avila*, *supra*, 38 Cal.4th at p. 549 [as to a *Wheeler* motion, "the issue is whether a particular prospective juror has been challenged because of group bias"].)

Some neutral reasons for a challenge are sufficiently self-evident, if honestly held, such that they require little additional explication.  One example: excusing a panelist because she has previously been victim to the same crime at issue in the case to be tried.  Moreover, a peremptory challenge may be based on a broad range of factors indicative of juror partiality, even those which are "apparently trivial" or "highly speculative."  (*People v. Williams* (1997) 16 Cal.4th 153, 191, citing *Wheeler*, *supra*, 22 Cal.3d at p. 275.)  Yet when it is not self-evident why an advocate would harbor a concern, the question of whether a neutral explanation is genuine and made in good faith becomes more pressing.

24

That is particularly so when, as here, an advocate uses a considerable number of challenges to exclude a large proportion of members of a cognizable group. (See *Jones*, *supra*, 51 Cal.4th at p. 362 [statistics of strikes constitute "probative circumstances" in evaluating whether trial court erred in denying *Batson*/*Wheeler* motion].) Out of 16 strikes exercised by the prosecution up to that point, 10 were used to remove jurors who shared the same ethnicity as defendants. Four of these challenges against Hispanics were consecutive. And when the motion was made, 10 out of 12 Hispanic panelists (83 percent) who had entered the jury box were peremptorily struck by the prosecution.

Advocates and courts both have a role to play in building a record worthy of deference. Advocates should bear in mind the record created by their own questioning — where the court and opposing counsel have failed to elicit panelist responses in a certain area of interest — as well as their explanations for peremptory challenges. In this instance, it is difficult to lend credence to the prosecutor's concern about "how [Juror 2723471] would respond when she hears that Gabriel Trevino is from a criminal street gang" when his brief questioning of this panelist failed to shed light on the nature of his apprehension or otherwise indicate his interest in meaningfully examining the topic, and the matter was far from self-evident.

The court, too, has its own obligations under the progeny of *Batson* and *Wheeler*. "[W]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*Silva*, *supra*, 25 Cal.4th at p. 386.) The court here acknowledged the "Wasco issue" justification and deemed it neutral and nonpretextual by blanket statements. It never clarified why it accepted the Wasco reason as an honest one. Another tendered basis for this strike, the reference to the prospective juror's "other answers" as they related to an

expectation of her reaction to Trevino, was not borne out by the record — but the court did not reject this reason or ask the prosecutor to explain further. In addition, the court improperly cited a justification not offered by the prosecutor: a lack of life experience. On this record, we are unable to conclude that the trial court made "a sincere and reasoned attempt to evaluate the prosecutor's explanation" regarding the strike of Juror 2723471. (*Hall*, *supra*, 35 Cal.3d at p. 167.) The court may have made a *sincere* attempt to assess the Wasco rationale, but it never explained why it decided this justification was not a pretext for a discriminatory purpose. Because the prosecutor's reason for this strike was not self-evident and the record is void of any explication from the court, we cannot find under these circumstances that the court made a *reasoned* attempt to determine whether the justification was a credible one.

Though we exercise great restraint in reviewing a prosecutor's explanations and typically afford deference to a trial court's *Batson*/*Wheeler* rulings, we can only perform a meaningful review when the record contains evidence of solid value. Providing an adequate record may prove onerous, particularly when jury selection extends over several days and involves a significant number of potential jurors. It can be difficult to keep all the panelists and their responses straight. Nevertheless, the obligation to avoid discrimination in jury selection is a pivotal one. It is the duty of courts and counsel to ensure the record is both accurate and adequately developed.

Excluding by peremptory challenge even "a single juror on the basis of race or ethnicity is an error of constitutional magnitude." (*Silva*, *supra*, 25 Cal.4th at p. 386.) The trial court's ruling — its finding that defendants had not met their burden of proving intentional discrimination with respect to the prosecutor's exclusion of Juror 2723471 — was unreasonable in light of the record of voir dire proceedings. Our conclusion renders it unnecessary to determine whether the trial

26

court erred in denying the *Batson*/*Wheeler* motion as to other Hispanic panelists. Because the court's denial of defendants' motion is unsupported, at least regarding Juror 2723471, we conclude that defendants were denied their right to a fair trial in violation of the equal protection clause of the federal Constitution and their right to a trial by a jury drawn from a representative cross-section of the community under the state Constitution. (*Batson*, *supra*, 476 U.S. at pp. 84–89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.) Such error is structural and requires reversal of defendants' resulting convictions. We can " 'neither indulge a presumption of regularity nor evaluate the resulting harm,' " for racial discrimination in jury selection " 'undermines the structural integrity of the criminal tribunal.' " (*People v. Turner* (1986) 42 Cal.3d 711, 728.)

### 2. *Comparative Analysis*

When a court undertakes comparative juror analysis, it engages in a comparison between, on the one hand, a challenged panelist, and on the other hand, similarly situated but unchallenged panelists who are not members of the challenged panelist's protected group. (See *Miller-El II*, *supra*, 545 U.S. at p. 241.) In this case, a comparative analysis would ask whether the prosecutor's justification for striking one Hispanic individual applies just as well to an otherwise similarly situated non-Hispanic individual who is permitted to serve on the jury. The high court has held that comparative analysis may be probative of purposeful discrimination at *Batson*'s third stage. (See *Miller-El II*, at p. 241.) The individuals compared need not be identical in every respect aside from ethnicity: "A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters." (*Miller-El II*, at p. 247, fn. 6.)

27

### a. Trial Court's Comparisons

In its review of the prosecutor's justifications, the trial court engaged in some comparative juror analysis. Regarding removed Hispanic female Juror 2510083, the court pointed out a similarly situated non-Hispanic male who was still on the panel (and who would sit on the jury), Juror 2861675. The court commented, "Mr. 2861675 is young. He's the only one that I find similarly situated perhaps to . . . Ms. 2510083 in terms of perhaps having a lack of life experience, but there were other reasons as he gave to those jurors as well, not just the lack of life experience."

The court endeavored to identify nonchallenged jurors who were similarly situated to challenged jurors in other respects. For the most part, it found no adequate comparisons. The court noted that the prosecutor had been consistent in excusing jurors who had "grown up in gang areas" or whose relatives "have been involved in criminal gang activities." The court also found that the prosecutor had been consistent in excusing prospective jurors who mentioned being upset about negative experiences with law enforcement. In other words, the court did not identify any panelists similarly situated as to those gang-related life experiences or as to negative encounters with law enforcement who had avoided a peremptory challenge by the prosecutor.

### b. Court of Appeal's Reasoning

On direct appeal, defendants urged the Court of Appeal to engage in comparative juror analysis. The court declined, stating that "[w]e do not engage in a comparative analysis of various juror responses to evaluate the good faith of the prosecutor's stated reasons for excusing a particular juror 'because comparative analysis of jurors unrealistically ignores "the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar." ' "

28

Defendants argue that the Court of Appeal erred in refusing to undertake comparative juror analysis. We agree. By avoiding comparative juror analysis in this context, the Court of Appeal went against the grain of established holdings from both our court and the high court, which recognize comparisons between panelists who are challenged and those who are not to be valuable tools in determining the credibility of explanations. (See, e.g., *Lenix*, *supra*, 44 Cal.4th at p. 622 [comparative juror analysis relevant to issue of intentional discrimination]; *Foster v. Chatman* (2016) ___ U.S. ___, ___ [136 S.Ct. 1737, 1750] [explanations "difficult to credit because the State willingly accepted white jurors with the same traits that supposedly rendered Garrett an unattractive juror"]; *Snyder v. Louisiana* (2008) 552 U.S. 472, 483 [implausibility of explanation for removing African American prospective juror "reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious"]; *Miller-El II*, *supra*, 545 U.S. at p. 241 ["More powerful than these bare statistics, however, are side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve"].)

The appellate court reached its erroneous conclusion by relying on an excerpt from *People v. Johnson* (1989) 47 Cal.3d 1194, 1220, which suggested that comparative analysis performed by a reviewing court is disfavored as impractical and insufficiently deferential to the trial court. But our subsequent decisions have superseded *Johnson* in this respect. What we held in *Lenix* is that "evidence of comparative juror analysis *must* be considered in the trial court and even for the first time on appeal if relied upon by defendant and the record is adequate to permit the urged comparisons." (*Lenix*, *supra*, 44 Cal.4th at p. 622, italics added.) We are mindful that comparative analysis is subject to inherent limitations, especially when performed for the first time on appeal. (*Ibid.*) But it was error for the Court of Appeal to categorically conclude that a court should not

29

undertake a comparative analysis for the first time on appeal — regardless of the adequacy of the record. The Court of Appeal also erred in declining to review the panelist comparison that *had* been made by the trial court, the comparison between Jurors 2510083 and 2861675. We overrule *People v. Johnson* (1989) 47 Cal.3d 1194 to the extent it is inconsistent with this opinion.

### III. CONCLUSION

Counsel have a role to play in ensuring that the record of proceedings sufficiently supports neutral, credible justifications for strikes of prospective jurors. But the ultimate responsibility of safeguarding the integrity of jury selection and our justice system rests with courts. (*Wheeler*, *supra*, 22 Cal.3d at p. 272.) For at least one excluded panelist in this case, the record does not permit us to find that the trial court met its obligations to make " 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' " and "clearly express its findings." (*Silva*, *supra*, 25 Cal.4th 345 at p. 385.) In light of the voir dire record, we conclude that the trial court erred in denying defendants' *Batson*/*Wheeler* motion. In addition, the Court of Appeal erred in refusing to conduct comparative juror analysis. We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

CUÉLLAR, J.

WE CONCUR:
CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
KRUGER, J.

31

**CONCURRING OPINION BY LIU, J.**

I agree that the trial court erred in rejecting defendants' claim of racial discrimination in jury selection under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). Today's decision is the first time in 16 years, and the second time in over 25 years, that this court has found a *Batson*/*Wheeler* violation. (*People v. Silva* (2001) 25 Cal.4th 345, 385 (*Silva*); *People v. Fuentes* (1991) 54 Cal.3d 707, 720 (*Fuentes*); see *People v. Harris* (2013) 57 Cal.4th 804, 885, 892–898 (conc. opn. of Liu, J.).) The occasion provides an opportunity to review key principles of *Batson*/*Wheeler* analysis and to make a few observations about the nature of the legal inquiry.

**I.**

In applying the three-stage *Batson*/*Wheeler* inquiry, our court and the United States Supreme Court have set forth several important precepts. First, "[a]lthough we generally 'accord great deference to the trial court's ruling that a particular reason is genuine,' we do so only when the trial court has made a sincere and reasoned attempt to evaluate *each* stated reason as applied to *each* challenged juror." (*Silva*, *supra*, 25 Cal.4th at pp. 385–386, italics added; see *Fuentes*, *supra*, 54 Cal.3d at p. 720 ["[A] truly 'reasoned attempt' to evaluate the prosecutor's explanations [citation] requires the court to address the challenged

1

jurors individually to determine whether any one of them has been improperly excluded."].)

Second, "when illegitimate grounds like race are in issue," a prosecutor's decision to strike a juror must "stand or fall on the plausibility of the reasons he gives." (*Miller-El v. Dretke* (2006) 545 U.S. 231, 252 (*Miller-El*).) It does not matter if "a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false"; a court's "substitution of a reason" not given by the prosecutor "does nothing to satisfy the prosecutor['s] burden of stating a racially neutral explanation for [his] own actions." (*Ibid.*)

Third, at the final stage of *Batson/Wheeler* analysis, courts must consider " ' "all relevant circumstances" ' " in determining whether a strike was improperly motivated, and this requires a careful "review of the entire record." (*People v. Lenix* (2008) 44 Cal.4th 602, 616 (*Lenix*); see *Arlington Heights v. Metropolitan Housing Development Corp* (1988) 429 U.S. 252, 266 ["Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."], quoted in *Foster v. Chatman* (2016) 578 U.S. __, __ [136 S.Ct. 1737, 1748] (*Foster*).)

Fourth, comparative juror analysis is an important tool in ferreting out improper discrimination (see *Foster*, *supra*, 578 U.S. at p. __ [136 S.Ct. at p. 1750]; *Snyder v. Louisiana* (2008) 552 U.S. 472, 483 (*Snyder*); *Miller-El*, *supra*, 545 U.S. at p. 241), and the mandate to consider all relevant circumstances means a court must undertake comparative juror analysis even if it is raised for the first time on appeal (*Lenix*, *supra*, 44 Cal.4th at p. 622).

Today's opinion explains how the trial court and the Court of Appeal ran afoul of these principles in evaluating the prosecutor's strike of Prospective Juror No. 2723471 (Juror 2723471). The trial court did not discharge its duty to make a

sincere and reasoned attempt to evaluate the prosecutor's reason for striking this juror. In upholding the strike, the trial court relied on a reason ("lack of life experience") that the prosecutor did not give. The Court of Appeal accorded deference to the trial court's ruling even though no deference was warranted. Neither the trial court's ruling nor the Court of Appeal's opinion provided the careful and thorough examination of the record that today's opinion does in determining whether the prosecutor's stated reason was credible. And the Court of Appeal improperly refused to conduct the comparative juror analysis urged by defendants.

The trial court and the Court of Appeal committed similar errors in evaluating the prosecutor's strikes of Prospective Juror No. 2547226 (Juror 2547226) and Prospective Juror No. 2510083 (Juror 2510083). Today's opinion identifies these errors but does not decide whether the trial court should have granted defendants' *Batson*/*Wheeler* motion with respect to these strikes. I would hold that these two strikes were improper as well.

As the court recounts (maj. opn., *ante*, at pp. 12–15), the prosecutor initially could not recall why he had struck Juror 2547226. After consulting his notes, he said: "I believe I asked her about 12 votes, each independent of the others and her being able to, you know, take on the task which is obviously the difficult task of any juror of both standing their own ground where they believe they are right, and also listening to other people. And I was concerned about her articulation about that role. I was concerned about her understanding of that and her ability to — quite frankly if she felt strongly to be heard in the course of jury deliberations." The trial court gave no indication that it examined this strike at all; its global ruling on the *Batson*/*Wheeler* motion did not mention this juror. In according deference to the trial court's ruling on this strike, the Court of Appeal erred.

3

The Court of Appeal relied on two reasons in upholding the strike of Juror 2547226. The first was that she "expressed that she did not know how many jurors had to agree to a verdict in a criminal case." But the prosecutor did not rely on this reason, so it cannot be a valid basis for upholding the strike. (Maj. opn., *ante*, at p. 14.) Second, the Court of Appeal said, "The prosecutor's stated reasons reflect that, based upon Juror 2547226's equivocal answers to voir dire questions, he had doubts about her being able to engage fully in the deliberative process and fulfill her role as a juror." But the juror's responses to whether she would have problems voicing disagreement with others ("I think I do better at listening than speaking my mind out" and "I don't think so") were not understood by the prosecutor *at that time* to signal equivocation. As today's opinion notes, the prosecutor inferred no equivocation from similar answers given by Prospective Juror No. 2570137 (Juror 2570137), a non-Hispanic female juror whom the prosecutor described as "very soft spoken." (Maj. opn., *ante*, at pp. 14–15.) In addition, immediately after questioning Juror 2547226, the prosecutor sought to confirm the independent-mindedness of Prospective Juror No. 2758066 (Juror 2758066) by reference to the answers given by Juror 2547226:

"Q. You've heard what some of the things that Ms. 2547226 and I have been talking about. *And is there anything that you disagree with as far as what she's been saying*?

"A. No.

"Q. As far as yourself being a member, a possible member on this jury, or on any jury, would you have any difficulty speaking your mind?

"A. No, none whatsoever.

"Q. Would you have any difficulty listening to other people hearing what they have to say and taking that into serious consideration?

4

"A.  I can listen to other people and make up my own mind."  (Italics added.)

If the prosecutor had thought Juror 2547226's answers expressed equivocation, why would the prosecutor have used that juror's answers as a reference point for assessing the next juror's ability to speak and make up his own mind?  It was only after the prosecutor reviewed his notes, after initially saying he did not know why he struck Juror 2547226, that the prosecutor mentioned concerns about her independence.  In light of the consistent answers Juror 2547226 gave and the prosecutor's voir dire of Jurors 2758066 and 2570137, the credibility of the stated reason for this strike does not find support in the record.

A careful review of the record also casts doubt on the credibility of the prosecutor's reasons for striking Juror 2510083.  The prosecutor said he was concerned about this juror's lack of life experience and the lack of sophistication in her answers, and because she had asked for a hardship release.  (Maj. opn., *ante*, at p. 17.)  The trial court noted that one of the non-Hispanic jurors still on the jury at the time of the *Batson* motion was "similarly situated" to Juror 2510083 with respect to life experience.  It therefore declined to credit that reason.  But the trial court found "other reasons" given by the prosecutor — presumably Juror 2510083's hardship request and lack of sophistication — to be credible.  The Court of Appeal affirmed on the hardship ground alone.

But the Court of Appeal erred in relying on that ground because any hardship had been resolved, in the prosecutor's presence, by the time he stated this reason for striking Juror 2510083.  (Maj. opn., *ante*, at p. 17.)  The Attorney General argues, for the first time before this court, that the prosecutor made a mistake of fact regarding Juror 2510083's hardship.  Although "an isolated mistake or misstatement *that the trial court recognizes as such* is generally insufficient to demonstrate discriminatory intent," we have said "it is another

5

matter altogether when . . . the record of voir dire provides no support for the prosecutor's stated reasons for exercising a peremptory challenge *and the trial court has failed to probe the issue*." (*Silva*, *supra*, 25 Cal.4th at p. 385, italics added.) Here, the trial court did not recognize the discrepancy and did not probe the issue. Because we have no basis for concluding that the prosecutor made a mistake, the hardship ground cannot serve as a valid basis for upholding the strike.

The only other reason given by the prosecutor was that he "thought there was a lack of sophistication in some of her answers." But it is not evident from the record what answers the prosecutor was referring to. The prosecutor's voir dire of Juror 2510083, which is reprinted in today's opinion (maj. opn., *ante*, at pp. 16–17), did not include any questions that could reasonably be understood to probe the juror's sophistication. The trial court also questioned this juror:

"Q. Ms. 2510083, how are you this morning?

"A. Good.

"Q. If we can get your information please.

"A. I'm an instructional aide at an elementary school and I'm not married and I don't have any children. I live in the southwest part of town and I have no jury experience.

"Q. All right. The questions we asked the other jurors, any of those questions relate to you, ma'am?

"A. Just a couple. I have a cousin that's CHP here in Bakersfield. I have another cousin in Yuma, Arizona and he's highway patrol. And then my cousin — they are all older, older cousins. She's a paralegal for an attorney here.

"Q. Here in town?

"A. Yeah.

"Q. Do you know what kind of law that attorney practices?

"A. Worker's comp.

6

"Q.  Go ahead.

"A.  That's it.

"Q.  That was it?

"A.  Yeah.

"Q.  All right.  Anything else . . . that leads you to believe that you would not be able to be a fair juror in this case?

"A.  No."

In addition, the defense questioned Juror 2510083 as follows:

"Q.  Ms. 2510083, do you think that people can be trained not to make any mistakes?

"A.  No.

"Q.  They can be trained to do some mistakes or less mistakes?

"A.  Yeah.  If they — yeah.

"Q.  But there's no perfection?

"A.  No.

"Q.  So you think that perhaps sometimes even police officers can make mistakes?

"A.  Yeah, everybody makes mistakes."

From this record, I am unable to discern which of Juror 2510083's answers signaled a lack of sophistication.  The prosecutor did not point to any specific answer, and the trial court did not inquire.  It is possible that the juror's demeanor or intonation affected the prosecutor's perception of her answers; the prosecutor said, "she came across of [*sic*] being quite young."  But because the trial court made no findings in that regard, our reliance on the juror's demeanor would be speculative.  (Cf. *Snyder*, *supra*, 552 U.S. at p. 479.)  In any event, it is not clear how any of the prosecutor's questions or other questions directed at Juror 2510083

7

served to gauge her level of sophistication. In sum, none of the prosecutor's reasons for striking Juror 2510083 withstands scrutiny.

## II.

As noted, the last time this court found a *Batson*/*Wheeler* violation was in *Silva* in 2001 and, before that, in *Fuentes* in 1991. In those cases, as in this one, the trial court did not meet its obligation to carefully examine each reason given for each strike and to make an adequate record that clearly explained the basis of its rulings. (Maj. opn., *ante*, at pp. 25–26, 31; see *Silva*, *supra*, 25 Cal.4th at p. 385 [trial court did not "make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation' " or "clearly express its findings"]; *Fuentes*, *supra*, 54 Cal.3d at p. 716, fn. 5 [same].) No deference may be accorded to such unexplained rulings when the reason for a strike is not "self-evident" (maj. opn., *ante*, at p. 24); a reviewing court must undertake its own thorough inquiry, with no presumption in favor of the trial court's ruling. Today's opinion reinforces the teaching of *Silva* and *Fuentes* that reviewing courts may find it "difficult to lend credence to the prosecutor's concern" when neither the prosecutor nor the trial court has made an adequate record. (Maj. opn., *ante*, at p. 25.)

I offer a few additional observations to put today's decision in context. As the high court has explained, "the adjudication of a *Batson* claim is, at bottom, a credibility determination." (*Foster*, *supra*, 578 U.S. at p. __ [136 S.Ct. at p. 1765].) In some cases, the inquiry turns up information that directly reveals the improper use of race. In *Foster,* the high court noted that "[t]he sheer number of references to race in [the prosecution's] file is arresting" and that "[a]n 'N' [for 'No'] appeared next to each of the black prospective jurors' names on the jury venire list" and "next to the name of each black prospective juror on the list of the 42 qualified prospective jurors." (*Id.* at p. __ [136 S.Ct. at p. 1755].) In *Miller-El*, the high court observed that "for decades leading up to the time this case was tried

8

prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries . . . ." (*Miller-El*, *supra*, 545 U.S. at p. 263.) A manual " 'outlining the reasoning for excluding minorities from jury service' " had been distributed to prosecutors (*id.* at p. 264), and the prosecutors in *Miller-El* "took their cues" from this manual "as shown by their notes of the race of each potential juror" (*id.* at p. 266).

But *Foster* and *Miller-El* involved trials that took place over 30 years ago. (See *Foster*, *supra*, 578 U.S. at p. __ [136 S.Ct. at p. 1755] [trial occurred just months after *Batson* was decided in 1986]; *Miller-El*, *supra*, 545 U.S. at pp. 235–236 [trial occurred just months before *Batson*].) I would surmise and hope, though I do not know for sure, that such brazenly unlawful practices are rare today.

More typical are the circumstances in *Snyder*, *supra*, 552 U.S. 472, which involved a 1996 capital trial. The prosecutor gave two reasons for striking a black juror, Jeffrey Brooks. As to the prosecutor's first reason — " 'he looked very nervous to me throughout the questioning' " — the high court said "we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous" because the trial court made no "specific finding on the record concerning Mr. Brooks' demeanor." (*Id.* at pp. 478, 479.) The prosecutor's second concern was that Mr. Brooks had a teaching obligation that might cause him to try " 'to go home quickly' " by returning " 'a lesser verdict so there wouldn't be a penalty phase.' " (*Id.* at p. 478.) The high court found this reason "suspicious" and "highly speculative" because (among other reasons) Mr. Brooks' "dean stated that he did not think that [Mr. Brooks' jury service] would be a problem" and "the record contains no suggestion that Mr. Brooks remained troubled after hearing the report of the dean's remarks." (*Id.* at pp. 482, 483.) Further, the high court said "[t]he implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting

obligations that appear to have been at least as serious as Mr. Brooks'." (*Id.* at p. 483.)

The nature of the case before us is closer to *Snyder* than to *Foster* or *Miller-El.* Our finding of improper discrimination as to Juror 2723471 is not based on any conduct that is particularly egregious or any evidence that approximates a smoking gun. Instead, the analysis in today's opinion involves a careful and comprehensive review of the record, highlighting the lack of comparable questioning of non-Hispanic jurors (maj. opn., *ante*, at p. 21), the lack of any indication that the prosecutor thought the juror was untruthful or uninformed (*id.* at p. 22), the prosecutor's lack of interest in "meaningfully examining" the Wasco issue with the juror (*id.* at p. 23), and the fact that the prosecutor struck Juror 2723471 despite her law enforcement ties "though he expressed his tendency to favor this characteristic with regard to other panelists" (*id.* at pp. 23–24).

Today's decision is an apt illustration of the " 'sensitive inquiry' " (*Foster*, *supra*, 578 U.S. at p. __ [136 S.Ct. at p. 1748]) and "review of the entire record" (*Lenix*, *supra*, 44 Cal.4th at p. 616) that *Batson*/*Wheeler* analysis demands. Rarely does a record contain direct evidence of purposeful discrimination. More often, as in this case and in *Snyder*, the inquiry calls on courts to assess the credibility of reasons given for a strike by drawing inferences from " 'such circumstantial . . . evidence of intent as may be available,' " including comparative juror analysis. (*Foster*, at p. __ [136 S.Ct. at p. 1748].) As today's opinion demonstrates, this requires a searching review of the record as well as sensitivity to the disproportionate effect that certain reasons — such as the gang-related reasons in this case — may have in excluding members of cognizable groups.

In most cases, courts cannot discern a prosecutor's subjective intent with anything approaching certainty. But the issue is not whether the evidence of improper discrimination approaches certainty or even amounts to clear and

10

convincing proof. The ultimate issue is "whether it was *more likely than not* that the challenge was improperly motivated." (*Johnson v. California* (2005) 545 U.S. 162, 170, italics added.) This probabilistic standard is not designed to elicit a definitive finding of deceit or racism. Instead, it defines a level of risk that courts cannot tolerate in light of the serious harms that racial discrimination in jury selection causes to the defendant, to the excluded juror, and to "public confidence in the fairness of our system of justice." (*Batson*, *supra*, 476 U.S. at p. 87; see *Miller-El*, *supra*, 545 U.S. at p. 238; *Powers v. Ohio* (1991) 499 U.S. 400, 412–414.) In the case before us, as in *Snyder*, the inferential analysis supports the conclusion that it is more likely than not that one or more strikes were improperly motivated. But I do not think the finding of a violation should brand the prosecutor a liar or a bigot. Such loaded terms obscure the systemic values that the constitutional prohibition on racial discrimination in jury selection is designed to serve.

With these observations, I join the opinion of the court.

**LIU, J.**

11

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Gutierrez, People v. Ramos & People v. Enriquez
_____

**Unpublished Opinion** XXX NP opn. filed 1/30/15 – 5th Dist.
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S224724 & S240419
**Date Filed:** June 1, 2017
_____

**Court:** Superior
**County:** Kern
**Judge:** Michael E. Dellostritto

_____

**Counsel:**

Scott Concklin, under appointment by the Supreme Court, for Defendant and Appellant Rene Gutierrez, Jr.

Donn Ginoza, under appointment by the Supreme Court, for Defendant and Appellant Gabriel Ramos.

Janet J. Gray, under appointment by the Supreme Court, for Defendant and Appellant Ramiro Enriquez.

Mary McComb, State Public Defender, Elias Batchelder and AJ Kutchins, Deputy State Public Defenders, as Amici Curiae on behalf of Defendants and Appellants.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler and Dane R. Gillette, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Eric L. Christoffersen, Rachelle A. Newcomb and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Scott Concklin
2205 Hilltop Drive
Redding, CA  96002
(530) 243-8510

Jennifer M. Poe
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5474