Filed 10/28/20  P. v. Cooper CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRANDON KYLE COOPER,<br><br>    Defendant and Appellant. | D075044<br><br><br>(Super. Ct. No. SCD272221) |

APPEAL from a judgment of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed in part, modified in part with directions.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Brandon Cooper was charged with murder (Pen. Code[1], § 187, subd. (a)) after he stabbed a friend who later died during surgery to repair the intestinal damage.  A jury acquitted Cooper of murder, but convicted him of the lesser included offense of voluntary manslaughter (§ 192, subd. (a)) and found true an allegation he used a knife as a deadly weapon in the commission of the crime (§§ 1192.7, subd. (c)(23); 12022, subd. (b)(1)).  Cooper admitted he served two prior prison terms (§ 667.5, subd. (b)).  The court sentenced Cooper to a total term of 14 years in state prison.

In this appeal, Cooper contends the court erred in denying his motion under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*) (collectively, *Batson / Wheeler*) to strike the jury panel because the prosecutor used peremptory challenges for two individuals who appeared to be African-American.  He also contends the court made three instructional errors:  (1) instructing the jury regarding contrived self-defense, (2) failing to instruct the jury regarding a lesser included offense of assault with a deadly weapon, and (3) failing to provide complete instructions on the issue of causation.  We conclude substantial evidence supported the court's finding that the prosecutor's race-neutral explanations for the peremptory challenges were credible.  We also conclude the court appropriately instructed the jury on the applicable law.

We permitted Cooper to submit a supplemental brief after oral argument in which he contends we should vacate the prior prison term enhancements based upon Senate Bill No. 136 (Stats. 2019, ch. 590, § 1),

---

[1]     Statutory references are to the Penal Code unless otherwise stated.

which amended section 667.5, subdivision (b) to eliminate sentencing enhancements for prior prison terms except for those involving sexually violent offenses. The People concede, and we agree, Senate Bill No. 136 applies retroactively and the prior prison term enhancements should be stricken since they were not based on sexually violent offenses. Therefore, we modify the judgment by striking the two one-year prior prison sentence enhancements. In all other respects, we affirm the judgment.

II

BACKGROUND

A

On May 29, 2017, at approximately 9:30 p.m., a witness saw two men arguing in an intersection. As the witness walked around a corner, he heard someone loudly scream, "What the fuck!" The witness looked toward the intersection and saw someone wearing a white T-shirt run down the street. A few seconds later another man walked around the corner with a backpack over his shoulder.

Another witness, who was waiting at a traffic light, saw a man who appeared panicked run into the intersection while holding his abdomen. The man slammed his hand on the hood of the witness's car and said, "I need a paramedic. Call 911. I've been stabbed." The man continued running as the witness called 911.

The victim entered a nearby market moaning and screaming. The victim said he had been stabbed and asked someone to call 911. The victim was holding his side. A customer in the market saw blood and called 911. The victim appeared panicked and did not want anyone to touch him or talk to him. He gave the name of the person who stabbed him and said he thought they were friends.

Police officers responded within one or two minutes. The victim drifted in and out of consciousness. One of the officers lifted the victim's shirt and saw intestines protruding from a cut on his abdomen. The officer applied pressure to the wound until paramedics arrived. The victim told the officer that Cooper stabbed him.

No weapons were found on the victim or in his clothing after he was taken to the hospital.

B

Medical staff at the hospital told the officers the injuries did not appear to be life threatening. However, physicians immediately performed an exploratory laparotomy because the victim's intestines were protruding from his body and a portion of the small intestine was cut. The victim had several other lacerations to his intestinal system and internal bleeding. Before his injuries could be repaired, the victim went into cardiopulmonary arrest and died despite efforts to resuscitate him.

An autopsy revealed the victim sustained a single vertical stab wound that was one-and-a-half inches in length and approximately one-sixteenth of an inch wide. The pathologist estimated the wound was at least two inches deep.

The victim had an enlarged heart, likely due to methamphetamine use. As a result, the victim's heart was not able to properly pump blood. The victim's toxicology results showed the presence of alcohol, methamphetamine, and marijuana.

The pathologist opined the cause of death was the stab wound to the abdomen with the contributing conditions of cardiac disease in the setting of methamphetamine abuse, and myocardial bridging of the left anterior descending coronary artery. The pathologist determined the cause of death

4

was the stabbing because the victim was in his usual state of health until he was stabbed and then was unable to recover from those injuries before he died.  The trauma surgeon also opined that both the stabbing and the victim's compromised cardiac condition were contributing factors to the victim's death.

## C

Surveillance video from the market showed Cooper entering the market alone a short time before the stabbing.  The victim and Cooper left through the main entrance around 9:29 p.m.  The victim returned to the market alone at 9:33 p.m.  Investigators traced the victim's path after the stabbing based on his drops of blood to the market.

Cooper was arrested in another part of the city the following evening.  An arresting officer found two knives inside Cooper's waistband, one of which was a small paring knife in a sheath.  The victim's blood was found on the paring knife.  Cooper's DNA was found on the handle of the knife.

## D

Cooper testified in his own defense.  He met and became friends with the victim in high school.  They had sexual relations a couple of times, but did not have a dating relationship.

The victim "sucker punched" Cooper a couple of times during a class when they had a disagreement.  Cooper fell back and kicked the victim in the face.  They parted ways and no longer talked at school.

Cooper saw the victim again in a bar in 2012 or 2013.  They were friendly and exchanged telephone numbers, but Cooper did not call the victim.

Cooper next saw the victim in 2015 when they were both homeless.  They exchanged numbers again and decided to hang out together so they

5

could watch each other's back. They both used methamphetamine and the victim drank alcohol constantly. Cooper said the victim became unpredictable, loud, and sometimes violent when he was under the influence. He described an incident when he thought the victim was going to hit another individual over the head with a bottle because the victim thought the individual had defecated in an area where the victim slept. The individual fled before anything happened.

Cooper said the victim threatened to hit him if Cooper made him mad. He said it is common for homeless individuals to carry knives and both he and the victim did so.

Cooper lost contact with the victim when Cooper went to jail and then to a rehabilitation program. Cooper contacted the victim in May 2017 after he relapsed and left the program. Cooper spent time at the victim's apartment. They smoked methamphetamine and the victim drank alcohol.

On the day of the incident, Cooper returned to the victim's apartment after running errands. He tried to contact the victim several times through a social media messaging application. The victim's roommate eventually let him into the apartment building and Cooper ran up the stairs. When he entered the apartment, Cooper collapsed, hitting his head on the floor. Cooper awoke next to the victim, who was also on the floor. The victim said he did not feel well.

Cooper and the victim hung out at the apartment during the day and smoked methamphetamine. The victim left and returned several times. When the victim returned to the apartment around 8:30 or 9:00 p.m., he looked at Cooper and said Cooper was going to die. Cooper grabbed some personal items, put them in a backpack, and said he was leaving. The victim

followed him to the front door.  Cooper said he would return later to collect the rest of his personal property.

As Cooper ran down the stairs, the victim followed closely behind. Cooper stopped at the front gate and asked the victim to leave him alone. Cooper walked down the street, but the victim followed.  The victim asked Cooper where he was going and where he would sleep.  Cooper asked why he cared.  Cooper crossed the street and the victim followed.  Cooper asked the victim to stop following him.  The victim asked Cooper why he was mad. Cooper said he just wanted to be left alone.

Cooper tried to get away from the victim by going into the nearby market, but the victim followed him and was waiting when Cooper left the market.  The victim continued following Cooper and making intimidating comments.

At an intersection, Cooper told the victim to leave him alone and to stop following him.  The victim sneered and laughed and continued to make comments.  When they got to the street, they parted ways and it looked like the victim was going to return to his apartment. Cooper said, "Fuck off [Victim].  Fuck you."  As he started to walk away, Cooper said he heard the victim run up behind him.  He testified he saw something in the victim's right hand which he thought was a knife.  Cooper said he stabbed the victim because he thought the victim was going to attack him.  The victim screamed, "what the fuck" and ran.

Cooper said he was in shock.  He did not call for help because he did not think the injury was serious and he did not want to get either of them in trouble.

Cooper admitted he lied to the police about what happened between him and the victim when he was arrested the following day.  He also

7

admitted he had previously broken a bone in someone's face, which required reconstructive surgery. He had also punched a security guard.

He admitted the victim was getting on his nerves during the incident. He did not tell the detectives he was scared of the victim.

Cooper wrote in a journal that he felt hatred and wanted to hurt people who hurt him and his family. He wrote, "How to leave a scar on them that won't heal. How to twist a knife in them that will bleed forever and make them fear for their family's safety?" He claimed he was only writing dramatically.

Cooper called three witnesses to testify regarding the victim's propensity for violence and a friend to testify about his own good character. One witness who dated the victim said the victim was unpredictable and became violent when he used alcohol or methamphetamine. The witness said the victim hit him on occasions. Police were called numerous times because of domestic violence between the witness and the victim.

Another witness who lived near the victim said he was aggressive and confrontational when under the influence of drugs or alcohol. The victim was a violent person who attacked the witness several times for no reason and also displayed a weapon and threatened him.

A former roommate of the victim testified the victim was usually even-tempered, but became angry and abusive after experiencing a medical problem. The victim shoved the roommate against a wall during an argument.

A friend of Cooper's testified she had seen Cooper at Alcoholics Anonymous meetings and had seen Cooper under the influence of methamphetamine. The friend had not seen Cooper be aggressive or violent and believed Cooper was a peaceful person.

E

In rebuttal, the prosecution played the video of Cooper's interview after his arrest. Officers told Cooper he was arrested for an outstanding warrant and that the victim said Cooper had attacked him. They did not say the victim died.

Cooper, who had known the victim since high school, said the victim was cool, but sometimes got on Cooper's nerves because of things the victim said. Cooper said the victim was not as nice as he pretended to be.

Cooper told the officers he was in the victim's apartment the prior evening and smoked methamphetamine with the victim. He said the victim made strange comments about Cooper dying. It got to the point where Cooper wanted to leave. He felt the victim's statements were like spitting and slapping him in the face. He was angry with the victim. Cooper claimed the victim was trying to provoke him and knew he was getting on Cooper's nerves.

He said the victim followed him and continued to make comments when Cooper left the victim's apartment. Cooper did not mention the stabbing during the interview. He claimed they separated near the market. He repeatedly denied he got into a fight or physical altercation with the victim.

Cooper said there should not be any blood on his knife because he had not stabbed anyone. Cooper said the victim did not pull a knife on him. He said he was under the influence of drugs and had difficulty remembering the events of that evening, but would remember a physical altercation.

Later, Cooper appeared shocked when officers told him the victim died and he was being booked for murder. Cooper insisted the victim was not dead and suggested he may have obtained a new identity. He continued to deny having an altercation with the victim.

9

The prosecution also presented evidence of other violent incidents involving Cooper. Cooper had an altercation with a security officer after Cooper stole an item from a store. Cooper also hit an acquaintance in the head with a hard object after the person called the police because Cooper refused to stop walking through the acquaintance's property.

III

DISCUSSION

A

*Batson/Wheeler Motion*

Cooper contends the court erred in denying his *Batson/Wheeler* objection to the prosecution's peremptory challenge to a potential juror who was African-American shortly after exercising a peremptory challenge to another potential juror of color. We conclude the court did not err in determining that, although Cooper had made a prime facie case, the prosecutor's proffered race-neutral reasons for excusing the jurors were credible.

1

*Applicable Law*

"The United States and California Constitutions prohibit the discriminatory use of peremptory challenges. (*Batson, supra,* 476 U.S. at p. 89; *Wheeler, supra,* 22 Cal.3d at pp. 276–277.) A three-step inquiry governs the analysis of *Batson/Wheeler* claims. 'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." [Citation.] Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. [Citations.] Third, "[i]f a race-neutral

10

explanation is tendered, the trial court must then decide … whether the opponent of the strike has proved purposeful racial discrimination." ' " (*People v. Miles* (2020) 9 Cal.5th 513, 538 (*Miles*).)

" ' "The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons. … All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." ' [Citation.] ' "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' " (*Miles, supra,* 9 Cal.5th at p. 539.)

"We review a trial court's determination regarding the sufficiency of tendered justifications with ' "great restraint." ' [Citation.] We presume an advocate's use of peremptory challenges occurs in a constitutional manner. [Citation.] When a reviewing court addresses the trial court's ruling on a *Batson/Wheeler* motion, it ordinarily reviews the issue for substantial evidence. [Citation.] A trial court's conclusions are entitled to deference only when the court made a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.' [Citation.] What courts should not do is substitute their own reasoning for the rationale given by the prosecutor, even if they can imagine a valid reason that would not be shown to be pretextual. '[A] prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. … If the stated

11

reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.' " (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1159.)

2

*Voir Dire*

During a discussion regarding self-defense, defense counsel asked jurors if they would run the other way if faced with a situation where the use of force was needed. Defense counsel asked for Juror No. 7's thoughts. Juror No. 7 responded saying, "I always like to take—the easiest approach is basically talk to somebody. And if sometimes that doesn't work, I like to withdraw. Sometimes, that doesn't work. So, I like to consider all my alternatives before that. And I have no issues if that's the case."

Defense counsel asked if Juror No. 7 would be okay with a law allowing a person to stand their ground and not retreat. Juror No. 7 said, "You know, everybody has different walks of life. So, whatever is conducive at the time, I can't, you know—you know, I'm not in that person's shoes. I may think this would have been done at the time. But of course, I'm, like, the third person hearing it, you know what I mean? I'm not there at the time. [¶] So if a person feels, you know, reasonably in danger, then they have to just proceed with what they feel they have to do at that moment."

When defense counsel asked other jurors' thoughts on the issue, juror No. 5 stated, "I feel that if you feel like you're threatened to the point where you [need] to do that , you have to protect yourself, do it. I don't have any second thoughts about that."

The prosecutor followed up on the line of questioning during his voir dire. He noted defense counsel asked if any jurors thought one should never use self-defense. He wanted to explore if anyone thought self-defense should

12

apply "whenever somebody thought that they were in danger regardless of the circumstance."

The prosecutor started with Juror No. 5, who had told defense counsel a person should not have a second thought about using self-defense if someone thought they were in danger. Juror No. 5 stated, "Well, I'm talking about a case where you feel that your life is being threatened. That's it. I mean, there's no other way to deal with that, I'm okay with it."

The prosecutor posed a hypothetical. "So, let's say, for example, somebody was out in the field. They saw somebody walk past them. That person did nothing to them. That person reminded them of somebody who robbed them 10 years ago, and they decided to pull their gun out and shoot them because they felt they were in danger. Do you think that's okay?"

When the juror asked the prosecutor to repeat the hypothetical, the prosecutor said, "So, the hypothetical that I asked you was somebody is sitting in a park; right? Complete stranger walks by them in their general direction. Does nothing to them. Says nothing to them. That person reminds them of somebody who had robbed them on a previous occasion. They pull their gun out and shoot that person because they feel that their life was in danger. Under those circumstances, is that okay?"

Juror No. 5 said, "I wouldn't say exactly that would be okay. If I was present there, and I happen to see this and you're putting me as in the place of seeing this happen?"

The prosecutor explained he was simply presenting a hypothetical, "whether you saw it or you heard about it." Juror No. 5 then said, "No, no. I don't think that's okay." After a further exchange, Juror No. 5 agreed there should be limits on the use of self-defense when someone subjectively feels their life is in danger.

The prosecutor turned the questioning to Juror No. 7 when that juror raised a hand. Juror No. 7 shared an incident of domestic violence in which the juror got a knife when the juror felt the juror's life was threatened. The juror stated, "In my mind, I have to say I did the right thing for my survival at the time." The prosecutor noted this was a powerful experience and discussing it made the juror somewhat emotional. Upon further questioning, Juror No. 7 agreed to follow the law. The prosecutor then followed up by questioning the group about self-defense and, specifically, carrying knives.

The prosecutor exercised the first peremptory challenge for Juror No. 7 and the third peremptory challenge for Juror No. 5. Defense counsel objected to the challenge as to Juror No. 5 based on *Batson/Wheeler*.

The court took a break to discuss the defense objection, noting Juror No. 5 was African-American, as is Cooper. Defense counsel stated the prosecution also exercised a peremptory challenge for Juror No. 7, who defense counsel believed was also African-American. Defense counsel believed both jurors gave answers that were good for both sides and did not see a basis for the peremptory challenges.

The court and counsel discussed the apparent ethnicity of Juror No. 7. For purposes of the motion, the court and counsel accepted the premise that Juror No. 7 was African-American.

Defense counsel argued Juror No. 5 gave answers favorable for both sides and defense counsel did not see a reason for excusing the juror. Defense counsel noted the challenge to Juror No. 5 was close in time to the challenge of Juror No. 7.

The prosecutor stated both jurors expressed strong feelings about the use of self-defense that concerned the prosecutor since self-defense was going to be the center of the defense case. Juror No. 7 shared using a knife when

14

the juror felt the juror's life was in danger, which the prosecutor noted was the same weapon involved in the case. The prosecutor also noted the emotional reaction the juror had in describing the event.

The prosecutor said Juror No. 5 expressed a strong view that if an individual viewed themselves as being in danger, they should not have second thoughts of using self-defense, which contrasts with the law regarding self-defense. The prosecutor posed a hypothetical of an individual shooting a person in the park for no reason other than the individual viewed themselves at risk, with no factual support, and asked the juror if that would be okay. The prosecutor noted the juror hesitated and did not initially acknowledge the issue, instead asking if the hypothetical assumed the juror witnessed the incident. The prosecutor stated the juror's reaction was "extremely alarming and concerning from the People's perspective because it just kind of reiterated [the juror's] personal view that it should be the individual that should not be second guessed if they had a concern of self-defense."

The prosecutor stated, "both responded and expressed a strong personal view that this is completely subjective and if they were to believe that they should use self-defense, nobody should second guess that. That is extremely concerning for the People and that is the reason and the basis for our peremptories."

The court acknowledged the difficulty of conducting voir dire on the issue of self-defense since people have very strong views on the issue that are frequently at odds with California law. The court said, "I don't believe that either of these two jurors under consideration, five or seven, expressed views that were consistent with California law on the subject." The court agreed with the prosecutor's analysis of the jurors' views of self-defense, saying, it "is the one I would make." The court found, "while the defense has made a

15

prima facie showing, I think the People have dispelled any concern of racial animus in the exercise of these challenges. I think there is an independent basis for the peremptory challenge other than their race." Therefore, the court denied the *Batson/Wheeler* motion.

During trial, the court made a further record about the issue. The court noted each side was given 20 peremptory challenges. The People used seven challenges and the defense used 11. One person of color was on the final jury panel, although the court was not certain if the juror was African-American or of East Asian descent. Three other prospective jurors were African-American. One was excused based on employment hardship. Another was excused by the defense on a peremptory challenge. A third juror did not make it to the jury box for consideration before the jury was empaneled.

3

*Analysis*

"Where, as here, the trial court ruled pursuant to the third stage of the analysis, we skip to that stage to examine whether the trial court properly credited the prosecutor's reasons for the challenges." (*Miles*, *supra*, 9 Cal.5th at p. 539.) At this stage, "the trial court evaluates the credibility of the prosecutor's neutral explanation. Credibility may be gauged by examining factors including but not limited to, ' "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." ' " (*Gutierrez*, *supra,* 2 Cal.5th at p. 1168.)

The court here made a serious and reasoned effort to consider the defense motion and evaluate the nondiscriminatory justifications offered. Juror No. 7 had strong opinions about the subjective need for self-defense and

16

had used a knife in a situation the juror thought called for self-defense. Even though the incident occurred years before, the juror was visibly emotional when describing the situation.

Although Juror No. 5 ultimately said the prosecutor's hypothetical would not be okay and that he would follow the law, the prosecutor was concerned with the juror's hesitation and the juror's strong beliefs about self-defense that were not consistent with California law, which requires more than a subjective belief one's life is in danger. Having seen and heard the voir dire exchange with both Juror No. 5 and Juror No. 7, as well as the demeanor of the prosecutor, the court was in the best position to evaluate the credibility of the prosecutor's proffered reason. The court concluded the prosecutor's neutral explanation was reasonable and credible. Substantial evidence supports the court's conclusion.

B

*Jury Instructions*

Cooper contends the court erred in instructing the jury in three ways. First, he contends the court erred in giving the CALCRIM No. 3472 regarding contrived self-defense. Second, he contends the court had a duty to instruct the jury regarding assault with a deadly weapon as a lesser included offense of murder. Third, he contends the court's instructions on causation were incomplete and prejudicial. We consider each contention in turn after discussing the general principles guiding our review.

1

*General Principles*

We independently review claims of instructional error, including the legal adequacy of jury instructions. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*), citing *People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "The

17

proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law ....' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole ... [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]" ' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111–1112.)

2

*Contrived Self-Defense Instruction*

The prosecutor requested CALCRIM No. 3472 based on evidence of the argument between Cooper and the victim before the stabbing along with evidence of Cooper's writing in which said he wanted to stab someone. Defense counsel objected to the instruction, stating the evidence showed the victim provoked Cooper. The court noted there was also impeachment testimony about incidents in which Cooper engaged in violent conduct without provocation. Over defense counsel's objection, the court gave CALCRIM No. 3472 which stated, "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

Generally, "a trial court must give a requested jury instruction if there is substantial evidence in the record supporting such an instruction." (*Mitchell*, *supra*, 7 Cal.5th at p. 583.) The court does not determine the credibility of the evidence. (*Ibid.*) Rather, in determining if the evidence is sufficient to give a requested instruction, the trial court determines if there is " 'evidence sufficient to deserve consideration by the jury, i.e., evidence from

18

which a jury composed of reasonable men could have concluded that the particular facts underlying the instruction did exist.' " (*People v. Strozier* (1993) 20 Cal.App.4th 55, 63.)  Likewise, on appeal, we consider only whether substantial evidence, i.e., evidence if believed by a rational jury, supported the requested instruction.  (*Mitchell*, at p. 583.)  " 'A trial judge's superior ability to evaluate the evidence renders it highly inappropriate for an appellate court to lightly question his determination to submit an issue to the jury.' " (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381.)

The jury heard evidence that Cooper had known the victim since high school and knew of the victim's propensity for violence, particularly when provoked.  Cooper said the victim commonly carried a knife.  The jury also heard evidence that the victim was getting on Cooper's nerves that night.  In addition, there was evidence Cooper also had a propensity for unprovoked violence and Cooper had written comments about wanting to stab someone.

Accepting Cooper's testimony as to how the stabbing occurred, the victim was walking away from Cooper, apparently to go home, when Cooper shouted after the victim, "Fuck off, [victim].  Fuck you!"  In response to that statement, the victim ran back to Cooper and Cooper stabbed the victim.

Although harsh words such as these "alone might not constitute a threat of unlawful violence" (*People v. Iboa* (2012) 207 Cal.App.4th 111, 120), understanding the context of the words is important.  The *Iboa* court determined that a defendant's threatening words combined with his physical conduct constituted a threat of unlawful violence prohibited by section 69.  "His conduct gave context to his threatening speech, which was intended to and did deter the firefighters and deputies from performing their official duties." (*Iboa,* at p. 120.)

Similarly here, a rational jury could believe that Cooper knew the victim well enough to know that shouting those words after the victim in this context would provoke him to act in an aggressive or violent manner and that would give Cooper an excuse to use force against the victim. Therefore, substantial evidence supported giving the instruction regarding contrived self-defense.

3

*Lesser Included Offense Instruction*

Cooper contends the court had a duty to sua sponte instruct the jury regarding assault with a deadly weapon as a lesser included offense of both murder and voluntary manslaughter because he was charged with a special circumstance allegation that he committed the crime with a deadly weapon. However, Cooper acknowledges the California Supreme Court concluded in *People v. Wolcott* (1983) 34 Cal.3d 92, 101 that enhancement allegations should not be considered in determining whether an offense is a lesser included offense of the charged offense. The Supreme Court has reaffirmed this conclusion. (*People v. Izaguirre* (2007) 42 Cal.4th 126, 128, 133 [enhancement allegations may not be considered in defining necessarily included offenses for the multiple conviction rule; *Apprendi v. New Jersey* (2000) 530 U.S. 466 is inapposite]; *People v. Sloan* (2007) 42 Cal.4th 110, 114; see also *People v. Alarcon* (2012) 210 Cal.App.4th 432, 436 [no duty to instruct on assault with a deadly weapon as lesser included offense of attempted murder].) Cooper acknowledges we are bound by this precedent and we see no reason to depart from it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d. 450, 455.)

## 4

### *Causation Instructions*

Cooper contends the court gave an incomplete statement of the law regard causation by giving CALCRIM No. 620 which advised the jury an act causes death only if it was a substantial factor in causing death, but did not include language requiring the jury to find the victim's death was a foreseeable and natural and probable consequence of Cooper's act. The People pointed out the court also gave CALCRIM No. 520 for the elements of murder, which instructed the jury that an act causes death "if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act." Cooper focused his argument in reply saying the lack of instruction regarding foreseeability of death from what he deems a "sufficiently minor" wound provided the jury with a lower standard of causation. We disagree and conclude the court properly instructed the jury on causation.

### *a*

### *Instructions Given*

The court instructed the jury with CALCRIM No. 520, which required the prosecution to prove as an element of murder with malice aforethought that the "defendant committed an act that caused the death of another person." The pattern instruction stated, "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] There may be more than one cause of death. An act causes death only if it is

21

a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."

The court next gave CALCRIM No. 620, stating "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor." The instruction continued, "[The victim] may have suffered from an illness or physical condition that made him more likely to die from the injury than the average person. The fact that [the victim] may have been more physically vulnerable is not a defense to murder or manslaughter. If the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death. This is true even if [the victim] would have died in a short time as a result of other causes or if another person of average health would not have died as a result of the defendant's actions."[2]

*b*

*Analysis*

Defense counsel did not object or request modification to the standard causation instructions. "If defendant believed the instructions were incomplete or needed elaboration, it was his obligation to request additional or clarifying instructions." (*People v. Dennis* (1998) 17 Cal.4th 468, 514.) Therefore, Cooper forfeited his contention the instructions were incomplete. (*Ibid.*)

Even considering the issue on the merits, we conclude the instructions correctly stated the law on causation. California courts have long held, "that

---

[2]    Cooper does not challenge the portion of CALCRIM No. 620 regarding the vulnerable victim doctrine.

there may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death." (*People v. Sanchez* (2001) 26 Cal.4th 834, 846 (*Sanchez*).) "[I]t is proximate causation, not direct or actual causation, which, together with the requisite culpable mens rea (malice), determines defendant's liability for murder." (*Id.* at p. 845.) " ' "A cause is concurrent if it was operative at the time of the death and acted with another cause to produce the death." ' " (*Id.* at p. 847.) However, even if there are concurrent causes of death, the defendant is criminally responsible if his conduct "was a substantial factor contributing to the result." (*People v. Catlin* (2001) 26 Cal.4th 81, 155 (*Catlin*).)

"When there are multiple concurrent causes of death, the jury need not decide whether the defendant's conduct was the primary cause of death, but need only decide whether the defendant's conduct was a substantial factor in causing the death." (*People v. Butler* (2010) 187 Cal.App.4th 998, 1009 (*Butler*).) In *People v. Jennings* (2010) 50 Cal.4th 616, the Supreme Court upheld a defendant's conviction of murder by torture because there was sufficient evidence from which a reasonable juror could have found the defendant's acts of physical abuse and starvation were concurrent causes of a child victim's death even though drugs given to the victim were also sufficient to cause death. (*Id.* at pp. 634, 642–643.) The Supreme Court explained "the tests for 'but for' and 'substantial factor' causation usually produce the same result, but the 'substantial factor' standard states a clearer rule that subsumes and reaches beyond the 'but for' test to more accurately address situations in which there are independent concurrent causes of an event." (*Id.* at p. 644.)

In *Catlin, supra,* 26 Cal.4th at pages 154–156 the Supreme Court held a defendant may be held liable for a criminal act causing death even if a

23

preexisting physical condition was also a substantial factor causing death. " 'So long as a victim's predisposing physical condition, regardless of its cause, is not the *only* substantial factor bringing about his death, that condition … in no way destroys the [defendant's] criminal responsibility for the death.' " (*Id.* at p. 155.)

Cooper does not seriously challenge these principles and expressly does not challenge the vulnerable victim doctrine. Instead, his "argument focuses on the actual injury inflicted" on the victim and "whether death was the foreseeable and natural and probable consequence" of Cooper's conduct. Cooper argues the jury may have concluded his stabbing of the victim was not a legal cause of the victim's death "given the survivable nature of the injury" if the jury "had been instructed with the foreseeable and natural and probable consequence language."

Contrary to Cooper's contention, the concept of foreseeability does not impose an additional higher standard than the substantial factor test. "Foreseeability does not require a high probability that the harm will occur, but merely that the harm be ' " 'a possible consequence which might reasonably have been contemplated.' " ' " (*Butler*, *supra*, 187 Cal.App.4th at p. 1011, quoting *People v. Medina* (2009) 46 Cal.4th 913, 920; see also *People v. Roberts* (1992) 2 Cal.4th 271, 321–322 ["A result cannot be the natural and probable cause of an act if the act was unforeseeable."].)

As we explained in *Butler*, "proximate causation requires that the death was a reasonably foreseeable, natural and probable consequence of the defendant's act, rather than a remote consequence that is so insignificant or theoretical that it cannot properly be regarded as a substantial factor in bringing about the death. [Citations.] Whether the defendant's conduct was a proximate, rather than remote, cause of death is ordinarily a factual

24

question for the jury unless ' "undisputed evidence … reveal[s] a cause so remote that … no rational trier of fact could find the needed nexus." ' [Citation.]  A jury's finding of proximate causation will be not disturbed on appeal if there is 'evidence from which it may be reasonably inferred that [the defendant's] act was a substantial factor in producing' the death." (*Butler*, *supra*, 187 Cal.App.4th at pp. 1009–1010.)

CALCRIM No. 520 instructed the jury that to convict the defendant of murder, they must find the death was "the direct, natural, and probable consequence of the act and the death would not have happened without the act."  The instruction defined natural and probable consequence as "one that a reasonable person would know is likely to happen if nothing unusual intervenes."  Both CALCRIM Nos. 520 and 620 instructed the jury that a substantial factor "is more than a trivial or remote factor."  In other words, to be a substantial factor, death from defendant's conduct must be more than a remote or insignificant consequence.  Together the instructions, in sum and substance, instructed the jury on the issue of foreseeability even though the word was not used.

The evidence amply supported the jury's finding that the victim's death was a natural and probable consequence of the stabbing.  The fact the victim's surgeon believed the victim could survive the stabbing injury does not mean the injuries he suffered were minor or trivial, as Cooper suggests.  Nor does it mean it was unforeseeable the victim could die from the injuries.  Witnesses who observed the victim in the moments after the stabbing described him as panicked, screaming and moaning in pain, and asking witnesses to call emergency services before he started drifting in and out of consciousness.  He was bleeding and his intestines protruded from a wound that was one and half inches long and approximately two inches deep into his

25

abdomen.  A wound two inches deep into the abdomen is not a minor injury as shown by the fact that physicians at the hospital immediately performed an exploratory surgery to identify and repair multiple injuries to his intestinal tract.

The fact the victim suffered a cardiac arrest before they could complete the intestinal repair does not mean his death was not a foreseeable or natural and probable consequence of the stabbing.  Both the attending surgeon and the pathologist opined the victim died from a combination of the stab wound and the underlying heart condition.  The pathologist stated the stabbing caused the victim's death because the victim was in his usual state of health until he was stabbed, which required him to go to the hospital.  He was not able to overcome those injuries, so the stabbing "led to the events causing his death."  The pathologist confirmed that while an enlarged heart, myocardial bridging, and methamphetamine use can result in sudden death, the stab wound was what actually caused the victim's death.  The surgeon also opined that both the stabbing and the victim's cardiac condition were factors in his death.

Additionally, Cooper, who had known the victim for years, knew the victim had a heart condition as well as other health conditions when Cooper stabbed the victim.  Therefore, it was reasonably foreseeable an injury to the victim's abdomen could cause his death.

The court properly instructed the jury regarding the element of causation.  Even if we were to assume there was error in failing to give a more specific pinpoint instruction on foreseeability, it was harmless because there was no reasonable possibility the jury would have found the victim's death was not a foreseeable, natural, and probable consequence of the

26

stabbing. (*People v. Burnett* (2003) 110 Cal.App.4th 868, 879, citing *People v. Bland* (2002) 28 Cal.4th 313, 338.)

C

*Prior Prison-Term Enhancements*

Cooper admitted, and the court found true, two prior prison term allegations. The first involved a prison term for convictions in 2004 and 2005 of auto theft (Veh. Code, § 10851, subd. (a)), grand theft (§ 487, subd. (c)), and assault with force likely to produce great bodily injury (§ 245, subd. (a)). The second involved a prison term for a 2013 conviction for grand theft (§ 487, subd. (c)).

While this appeal was pending, the Governor signed Senate Bill No. 136 (Stats. 2019, ch. 590, § 1), which amended section 667.5, subdivision (b) to eliminate one-year sentence enhancements for all prior prison terms except those served for a sexually violent offense within the meaning of Welfare and Institutions Code section 6600, subdivision (b). The amendment became effective January 1, 2020.

The People concede, and we agree, Cooper is entitled to the ameliorative change in the law under the amended statute because the judgment against him is not yet final. (*In re Estrada* (1965) 63 Cal.2d 740; *People v. Jennings* (2019) 42 Cal.App.5th 664, 682.) Since his prison priors do not qualify for the enhancement under amended section 667.5, subdivision (b), the two one-year prior prison term enhancements can no longer be imposed. The People also concede that where, as here, "an enhancement is erroneously imposed and the trial court has already imposed the maximum possible sentence, remand for resentencing is unnecessary." (*People v. Gastelum* (2020) 45 Cal.App.5th 757, 773; see also *People v. Taylor*

27

(2004) 118 Cal.App.4th 11, 31.)  Accordingly, we strike the enhancements and affirm the judgment as modified.

IV

DISPOSITION

The judgment is modified by striking the two one-year prior prison term enhancements imposed under former Penal Code, section 667.5, subd. (b).  As so modified, the judgment is affirmed.  The trial court is directed to amend the abstract of judgment accordingly and to forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

HALLER, J.

28