Filed 3/18/24  P. v. Newson CA4/1
Review denied 7/10/24; reposted with Supreme Court order and statement

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D082242 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1303213) |
| ERIC VAN NEWSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael A. Smith, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed in part, affirmed in all other respects, and remanded with directions.

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Kristen Ramirez, Deputy Attorneys General, for Plaintiff and Respondent.

Eric Van Newson appeals from a jury verdict finding him guilty of two counts of assault with a firearm upon a peace officer (Pen. Code, § 245, subd. (d)(1); counts 3 & 4) and one count of firearm possession by a felon (*id.*, § 29800, subd. (a); count 5). The jury also found true various special allegations, including that the assaults were committed to benefit a criminal street gang. (*Id.*, § 186.22, subd. (b)(1)(B).) Newson primarily contends the trial court reversibly erred in denying his motion under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), which challenged the prosecutor's peremptory strike of a Black juror. In the alternative, he argues postjudgment changes to section 186.22 and relevant sentencing provisions require remand.

We conclude the trial court did not err in denying the *Batson/Wheeler* motion, as the trial court corroborated the same body language concerns raised by the prosecutor and that finding is due great deference. We also accept the People's concession that the gang enhancement findings must be vacated and the matter remanded for retrial of the gang enhancements. Whether or not the People elect to retry the gang enhancement allegations, Newson is entitled to full resentencing on remand. We thus reverse in part, affirm in all other respects, and remand with directions.

I.

In 2013, two shooters, including Newson, exchanged gunfire with two San Bernardino police officers, one of whom was shot. Newson's first trial on the resultant charges ended in a mistrial due to jury deadlock. In a 2019 retrial, the jury hung on two counts of attempted murder of a peace officer, found Newson guilty of the remaining counts, and found true several special allegations. Thereafter, the court sentenced Newson to a total state prison term of 43 years and 4 months.

II.

A.

First, Newson argues the trial court erroneously denied his *Batson/Wheeler* motion. We disagree.

1.

Newson is Black. So was at least one potential juror for the retrial, Juror No. 22.

During voir dire, Juror No. 22 disclosed she was a "premium customer service [agent]" for a major airline and had "[a]lways" worked in customer service. Juror No. 22 also said she "was on [a reality court show] for not paying back a loan to [her] mom." Juror No. 22 agreed with the prosecutor that she (1) "[w]ould [not] hesitate" to convict if "the case was proven beyond a reasonable doubt" and (2) would not hold the prosecutor to any higher standard. When asked if she worked well in groups, she responded, "Oh, yes, totally."

Later in voir dire, the court disclosed "the two officers involved in this incident are [W]hite" while "Newson is [Black]." The court asked if all the jurors would agree that "who might be wrong or might be right in any case" would "depend[ ] on the facts." Juror No. 22 expressly agreed. The court then asked if (1) anyone would "immediately have a reaction who must be right or who must be wrong" in such a circumstance, and (2) everyone could "look at the facts and evidence" to determine "what happened in this case and this case only." No juror responded verbally to either question.

The People used their sixth peremptory challenge to strike Juror No. 22 without ever passing on the jury as empaneled. Newson's counsel objected under *Batson/Wheeler*.

The court invited the prosecutor to respond to the motion. He "kicked" Juror No. 22 for two reasons. First, "her body language indicated to [him] that she didn't like [him] or defense counsel," although he "couldn't figure out exactly why." "[M]ore importantly," he had "tried this case once before and it hung 11 to 1." Thus, he was "trying to screen . . . for anybody that might be willing to dig in their heels and not work with the other jurors." The prosecutor noted he "ask[s] all the jurors if they work well in groups," and he was concerned that Juror No. 22 had "brought a case against her own mom" on a reality court show. Based on his personal experience with a district attorney who went on the same reality court show, he thought "individuals that are willing to bring their problems onto TV nationally" could be "overly headstrong" and "hang a jury up and not listen to other people."

Newson's counsel did not "quite understand the reasoning of" the second point, although he also acknowledged knowing the district attorney in question. He did not expressly respond to the prosecutor's body language concern.

The court stated, as to the reality court show justification: "[T]hat [district attorney], I think, exhibits personality traits that either side would excuse from a jury, . . . so there might be something to that." The court then "note[d] there were times, particularly whenever there was a question about race, in particular, when I was asking the questions about [W]hite police officers, [B]lack individuals, [Juror No. 22] did, kind of, frown and looked uncomfortable with the questions. So I noted that[ ] kind of[ ] body language[ ] as well. The [reality court show] thing, maybe, causes one to think, maybe, a little bit out of the mainstream." The trial court then stated it was "satisfied . . . that the stated reasons demonstrate that the excusal was not on the basis of race."

4

The trial court further noted that it presided over the first trial, in which, after the jury hung, one or two Black jurors "expressed the view that they would be unlikely to convict a young [B]lack male of an offense against [W]hite police officers." The court unequivocally stated that to exclude Black jurors for that reason would be unconstitutional. But the court found "the stated reason, particularly body language, which I noted on at least one or two occasions, demonstrates to me that the excusal was not made on the basis of race."

## 2.

To use peremptory challenges to exclude prospective jurors based on a protected ground like race "violates a defendant's right[s] to trial by a jury drawn from a representative cross-section of the community" and equal protection. (*People v. Blacksher* (2011) 52 Cal.4th 769, 801.) To exclude even one potential juror on such a basis is structural error mandating reversal. (*People v. Silas* (2021) 68 Cal.App.5th 1057, 1068.)

A *Batson*/*Wheeler* motion contesting a peremptory challenge comprises three steps. Throughout, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (*Purkett v. Elem* (1995) 514 U.S. 765, 768.) First, the movant must make a prima facie showing of "discriminatory purpose." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).) If the court finds that showing adequate, the burden shifts to the strike proponent to provide a race-neutral and case-specific explanation. (*People v. Fuentes* (1991) 54 Cal.3d 707, 714-717 (*Fuentes*).) A reason is "deemed race neutral" "[u]nless a discriminatory intent is inherent." (*Hernandez v. New York* (1991) 500 U.S. 352, 360.) Finally, if a race-neutral reason is offered, "the trial court must decide whether the movant has proven purposeful discrimination." (*Gutierrez*,

5

*supra*, 2 Cal.5th at p. 1158.) This step "focuses on the subjective genuineness of the reason, not the objective reasonableness." (*Ibid.*)

We presume peremptory challenges are used constitutionally. (*People v. Clair* (1992) 2 Cal.4th 629, 652.) And, as the trial court is best situated to assess the nonverbal components of voir dire, including the credibility of the jurors and the prosecutor, we generally "accord great deference to the trial court's ruling that a particular reason is genuine" (*Fuentes*, *supra*, 54 Cal.3d at pp. 720-721) and review the trial court's determination for substantial evidence (*Gutierrez*, *supra*, 2 Cal.5th at p. 1159). Such deference may be undue, however, where the trial court fails to make "a sincere and reasoned attempt to evaluate each stated reason as applied to the challenged juror." (*People v. Silva* (2001) 25 Cal.4th 345, 385-386 (*Silva*).)

3.

Here, by inviting the prosecutor to justify his peremptory challenge, the trial court impliedly found a prima facie showing of discrimination; thus, the first step is "moot, and the only question remaining is whether the individual justifications were adequate." (*People v. Arias* (1996) 13 Cal.4th 92, 135.)

We agree with Newson that the circumstances of this case—including the races of the officers, Juror No. 22, and Newson and the prior jury hanging along racial lines—heighten the importance of closely scrutinizing the possibility the peremptory challenge was improperly based on race. (*People v. Hardy* (2018) 5 Cal.5th 56, 78 (*Hardy*).) However, we also find it important that, as Newson conceded during oral argument, the prosecutor never "stated that the first trial ended in a hung jury because [Black] jurors were the ones that did not vote to convict" and he "wanted to avoid" that outcome "a second time." Further, the record demonstrates the trial court's awareness of and

6

sensitivity to these concerns in deciding Newson's motion. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 761.)

Bearing these principles in mind and reviewing, but not reweighing, the plausibility of the prosecutor's stated reasons in view of the entire record (*People v. Lenix* (2008) 44 Cal.4th 602, 621 (*Lenix*)), we conclude the trial court did not err in denying Newson's *Batson/Wheeler* motion.

a.

Newson claims the prosecutor's body-language reason is invalid, as: the court upheld the challenge based on different body language than that observed by the prosecutor; the prosecutor did not explain why Juror No. 22's body language indicated bias, given she appeared to dislike both sides equally; and neither the court nor the prosecutor questioned Juror No. 22 about her body language. We disagree.

Most importantly, we are unconvinced by Newson's argument the trial court impermissibly relied on different body language than the prosecutor in finding this reason genuinely race neutral. It is foundational that both trial and reviewing courts "must examine only those reasons actually expressed" by the prosecutor in analyzing the authenticity of a peremptory challenge's race neutrality. (*Gutierrez*, *supra*, 2 Cal. 5th at p. 1167.) As to issues of demeanor, however, our Supreme Court has recognized that "the court may not have observed every gesture, expression[,] or interaction relied upon by the prosecutor," given its "different vantage point" and the possibility it "may have, for example, been looking at another panelist or making a note when the described behavior occurred." (*Lenix*, *supra*, 44 Cal.4th at p. 625.) Thus, so long as the court is "satisfied that the specifics offered by the prosecutor are consistent with the answers it heard and the overall behavior of the panelist," and the record "reflect[s] the trial court's determination on this

7

point," deference is due on review, as "[i]t is the trial court which is best able to place jurors' answers in context and draw meaning from all circumstances, including matters not discernable from the cold record." (*Id.* at pp. 625-626.)

Here, in assessing the prosecutor's demeanor justification, the trial court said it "noted that[ ] kind of[ ] body language[ ] as well." The People are thus correct that the trial court's observations corroborated, rather than improperly replaced, the prosecutor's stated demeanor concern. Observing frowning and discomfort when relevant subject matter is referenced is consistent with Juror No. 22 looking like she disliked both sides. As the People argue, both behaviors can demonstrate a general "[h]ostility toward . . . the proceedings." Although interracial dynamics may be an issue "more likely to be . . . pressing . . . among [Black people]," as Newson asserts, striking a juror who appears uncomfortable with a central issue in the case is not per se discriminatory. (E.g., *People v. Martin* (1998) 64 Cal.App.4th 378, 384-385 [striking juror uncomfortable with trial due to personal values arising from religion not discriminatory].) Thus, the prosecutor's concern was not, as Newson argues, "bogus on its face."

Further, despite Newson's contrary claims, the court's and the prosecutor's demeanor observations were not "vague." Even when a prosecutor's demeanor-based justification is vague or inadequate, however, the trial court can nonetheless affirm its race neutrality *either* by probing the reason *or* placing on the record its own observations, to which the prosecutor acquiesces. (*People v. Allen* (2004) 115 Cal.App.4th 542, 552-553 & fn. 8.) Here, the court placed its corroborating observations on the record, and the prosecutor tacitly accepted them. We thus agree with the People that the authorities Newson cites, for his proposition that a freestanding body

8

language rationale lacking a description of that body language is inadequate, are inapposite.

As to Newson's other claims, bias against one side is not the sole allowable demeanor-based justification.  It is permissible to strike a juror for his or her perceived discomfort with the proceedings or a relevant issue. (*People v. Zimmerman* (1984) 36 Cal.3d 154, 161 [peremptory challenges to jurors with reservations about death penalty valid].)  Nor was further questioning of Juror No. 22 required.  The prosecutor had already questioned her at some length, and direct questions by the prosecutor or the court about her body language risked offense, which would only further support a strike. (*Wheeler*, *supra*, 22 Cal.3d at p. 275, fn. 16.)  Particularly where, as here, defense counsel did not dispute the accuracy or genuineness of the prosecutor's demeanor observations in the trial court, such concerns can be legitimate race-neutral grounds for excusal.  (*People v. Baker* (2021) 10 Cal.5th 1044, 1078-1079.)

Accordingly, we conclude substantial evidence supported the trial court's determination that the prosecutor's demeanor-based reason for striking Juror No. 22 was genuinely race neutral.  To the extent Newson argues the trial court erred as a matter of law, we disagree.

b.

As to the prosecutor's second justification—that Juror No. 22's appearance on a reality court show signaled she may be headstrong and unwilling to listen to and work well with others, risking a hung jury—we are not convinced, as Newson claims, that the trial court relied on a different reason than the prosecutor's.  The court's acknowledgment there "might be something" to the prosecutor's concerns appears to accept the offered rationale.

Nonetheless, on this record, we agree with Newson that the trial court had a duty to further probe this justification. The prosecutor's concern about Juror No. 22 not working well with or listening to others was directly contradicted by her claims that she "totally" works well with others, would not hesitate to convict if the evidence so warranted, and had spent her life working in customer service. "[M]ore is required of the trial court" "[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both." (*Silva, supra*, 25 Cal.4th at p. 386.)

Although the prosecutor erred in saying Juror No. 22 initiated the suit that led to her appearance on the reality court show, that seemingly sincere error does not per se render the reason pretextual. (*Hardy, supra*, 5 Cal.5th at p. 79.) Even as a defendant on the show, Juror No. 22 nonetheless was willing to air her problems on national television, which was the crux of the prosecutor's concern. The "entire rationale" accordingly does not "fall[ ]" due to this error. And, despite Newson's claim to the contrary, a prosecutor is entitled to rely on personal experience in exercising peremptory challenges; to believe a person who appears on a such a show may share undesirable characteristics with a person known to have appeared on the same show is not inherently implausible. We decline to address Newson's unsupported speculations as to inferences one can draw from Juror No. 22's appearance on the show.

In sum, we conclude the trial court failed to ascertain adequately the credibility of this reason. Given the evidence contradicting the prosecutor's justification, this reason is suspect, but not, as Newson argues, necessarily discriminatory.

c.

Evaluating both the prosecutor's stated reasons holistically, we conclude the court did not err in denying Newson's motion. (*People v. Smith* (2018) 4 Cal.5th 1134, 1157-1158 (*Smith*).)

Although the "positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility," we conclude that is not so here. (*Smith, supra,* 4 Cal.5th at pp. 1157-1158.) "[A]t least *one* of the two . . . principal justifications for the strike . . . withstand[s] closer scrutiny." (*Foster v. Chatman* (2016) 578 U.S. 488, 508.)

Here, as Newson acknowledges, the trial court did not simply make a "global finding that the reasons appear sufficient." (*Silva, supra,* 25 Cal.4th at p. 386.) The court assessed the reasons individually and combined, and, importantly, provided its own corroborating observations as to Juror No. 22's body language. Ultimately, "[w]hen a trial judge validates a prosecutor's challenge based on the prospective juror's demeanor, and makes clear that such demeanor is the primary reason for validating the challenge, then it is difficult to imagine any circumstance under which an appellate court would second-guess that judgment." (*Lenix, supra,* 44 Cal.4th at p. 634 (conc. opn. of Moreno, J.).) We conclude great deference is due to the court's determination that Juror No. 22's potentially problematic demeanor was a significant and genuinely race-neutral reason to strike her. Although we find troubling the court's failure to push back on the prosecutor's reality court show justification, we determine those shortcomings do not overcome the near unassailability of the demeanor finding on review. We accordingly conclude the court did not err in denying Newson's *Batson/Wheeler* motion.

11

B.

Newson also contends the gang enhancements imposed under section 186.22, subdivision (b)(1)(B), must be reversed because of (1) retroactive amendments to section 186.22 and (2) the lack of substantial evidence in the record that Newson committed the offenses with "the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).)  Newson has withdrawn his claim that remand is further required under section 1109.

The People concede the retroactivity of the amendments to section 186.22 and the need to vacate the gang enhancement findings and remand the matter for retrial on the enhancements, given the shortcomings of the evidence presented at trial under the amended statute.  We accept the People's concession.  (*People v. Sek* (2022) 74 Cal.App.5th 657, 669 (*Sek*).) Unlike the court in *Sek*, however, we must also assess whether retrial would violate double jeopardy, given Newson's additional claim that the record evidence was insufficient to prove a violation of the statute at the time of trial.  (*Ibid.*)

Having (1) examined the entire record "in the light most favorable to the judgment to determine whether it discloses substantial evidence— evidence that is reasonable, credible[,] and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" and (2) "presume[d] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053), we conclude substantial evidence supported the element of intent in the gang enhancements as originally tried.

Here, the People elicited testimony from a gang expert that Newson was an "active associate" of the California Garden Crips (CGC) and a member

of a different Crip "set."  He was riding in a car owned by a documented CGC member with two suspected CGC members and another active associate of CGC.  The expert testified that acts of violence by gang members and associates benefit a gang by sending a message to rival gangs and instilling fear in the community.  Newson shooting at officers not only benefited CGC in this manner but also permitted two likely CGC members to escape apprehension by the officers.

The jury was instructed on the showing required to establish the intent element.  The jury was also instructed on how to use circumstantial evidence for this issue.  Newson's counsel questioned the sufficiency of the evidence of intent in closing, but the jury nonetheless found the allegation true.

On this record, we conclude a reasonable jury could have found beyond a reasonable doubt Newson shot at the officers with the intent to "promote, further, or assist in criminal conduct by" CGC members.  (§ 186.22, subd. (b)(1).)  We are not persuaded by Newson's contrary arguments.  In particular, Newson is incorrect that a defendant's intentional commission of the charged offense with known gang members cannot support the intent element.  (*People v. Albillar* (2010) 51 Cal.4th 47, 68.)  Because we conclude substantial evidence underpins the jury's intent finding, the People may seek retrial of the gang enhancements on remand.

As this disposition requires reversal of Newson's sentence and resentencing in accordance with current law, we need not resolve Newson's additional independent arguments as to the need to remand for resentencing.  (*Sek*, *supra*, 74 Cal.App.5th at p. 670.)  Even were that not the case, however, we lack the requisite level of confidence that the trial court would have imposed the same upper-term sentence had the aggravating factors been put

13

to the jury, and we would thus remand for full resentencing regardless. (See *People v. Lopez* (2022) 78 Cal.App.5th 459, 465-469.)

### III.

We vacate the jury's findings on the gang enhancements and reverse that portion of the judgment. We affirm the judgment in all other respects. We remand this matter to the trial court, where the People shall have 60 days from the date of the remittitur to file an election to retry Newson on the reversed gang enhancements. (Pen. Code § 1382, subd. (a)(2).) Following retrial, or if the People elect not to retry Newson on the enhancements, the trial court shall fully resentence Newson in accordance with current law, including, without limitation, Penal Code section 1170 and, should Newson file an appropriate motion to strike one or more enhancements, section 1385. Thereafter, the trial court shall amend the abstract of judgment to reflect the new sentence, including the additional six days of presentence custody credits agreed to by the parties, and send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

CASTILLO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

KELETY, J.

14

Court of Appeal, Fourth Appellate District, Division One - No. D082242

**S284695**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

_____

THE PEOPLE, Plaintiff and Respondent,

v.

ERIC VAN NEWSON, Defendant and Appellant.

_____

The petition for review is denied.

Kruger, J., was absent and did not participate.

(See Concurring Statement by Justice Liu)

_____/s/_____
                    *Chief Justice*

PEOPLE v. NEWSON

S284695


Concurring Statement by Justice Liu


Although I vote to deny review in this case, I note that the issue concerning the prosecutor's strike of Prospective Juror No. 22 (Juror No. 22), a Black woman, provides yet another illustration of why the Legislature believed it necessary to enact Assembly Bill No. 3070 (Reg. Sess. 2019– 2020) to overhaul the legal framework for eliminating racial discrimination in jury selection. (See Stats. 2020, ch. 318, § 2, adding Code Civ. Proc., § 231.7; *People v. Nadey* (2024) __ Cal.5th __, __ [2024 WL 3016945, p. *56] (*Nadey*) [prosecutor struck several Black women jurors for reasons presumptively invalid under Code Civ. Proc., § 231.7].)

The prosecutor here gave two reasons for striking Juror No. 22 in the second trial (after an initial mistrial) of defendant Eric Van Newson, a Black man charged with assaulting two White police officers with an illegally possessed firearm. The prosecutor first said, "[T]he primary reason I kicked her were both — her body language indicated to me that she didn't like me or defense counsel. I couldn't figure out exactly why." The prosecutor then said, "But more importantly, I tried this case once before and it hung 11 to 1. Just one juror, on the most important count, Officer Hysen. So I'm trying to screen potential jurors for anybody that might be willing to dig in their heels and not work with the other jurors. [¶] What I got as feedback for the last-hanged jury, the last trial — I ask all the jurors if they work well in groups. My

1

concern for Juror 22, she was on Judge Judy, and she said she brought a case against her own mom regarding some type of loan. That, to me, indicated someone, based on my experience that I mentioned with 22, with a [district attorney] that we had in our office, who also went on Judge Judy, and that individual was hard to work with. [¶] From watching Judge Judy, individuals that are willing to bring their problems onto TV nationally over an issue, much less with their mother, that's someone that could also hang a jury up and not listen to other people. It seems like headstrong character —overly headstrong for that situation. I want to avoid that. That was the reason that I kicked her."

In evaluating these stated reasons, the trial court said: "I did note there were times, particularly whenever there was a question about race, in particular, when I was asking the questions about white police officers, black individuals, she did, kind of, frown and looked uncomfortable with the questions. So I noted that, kind of, body language, as well. The Judge Judy thing, maybe, causes one to think, maybe, a little bit out of the mainstream.

"So I'm satisfied, at this point, that the stated reasons demonstrate that the excusal was not on the basis of race. I would note, however, number one, I was the trial judge the first time this case was tried, so I'm aware of the situation that [the prosecutor] is referring to, where there was one or possibly two possible jurors who happened to be African American, who afterward, perhaps, expressed the view that they would be unlikely to convict a young black male of an offense against white police officers.

"That is not a basis to exclude black individuals from this panel, either male or female. There would have to be something specific about the individual that would justify an excusal based upon a non-race basis. If the only basis of exercising a peremptory challenge is, well, last time we tried this, we had an African American juror who wouldn't convict an African American male, so I'm going to exclude African Americans, no, you can't do that. That would be precluded by Batson-Wheeler.

"It would have to be something specific about that juror. So, I think, that should be clear. But in this case, with regards to [Juror No. 22], I'm satisfied that the stated reason, particularly body language, which I noted on at least one or two occasions, demonstrates to me that the excusal was not made on the basis of race. So at this time, the Batson-Wheeler motion is denied, obviously, without prejudice to renew it if there is something else that occurs." (See *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.)

As to the demeanor-based reason, the trial court did not confirm the prosecutor's observation that "her body language indicated to me that she didn't like me or defense counsel." Instead, the trial court offered its own, different observation of Juror No. 22's demeanor: "I did note there were times, particularly whenever there was a question about race, in particular, when I was asking the questions about white police officers, black individuals, she did, kind of, frown and looked uncomfortable with the questions." The trial court did not explain how its own observation corroborated the prosecutor's. The Court of Appeal, citing our case law, bridged this gap by explaining that "the trial court's observations corroborated, rather than improperly replaced, the prosecutor's stated

3

demeanor concern. Observing frowning and discomfort when relevant subject matter is referenced is consistent with Juror No. 22 looking like she disliked both sides. As the People argue, both behaviors can demonstrate a general '[h]ostility toward . . . the proceedings.' "

This analysis, though supported by precedent, leaves much to be desired. To be sure, both the body language reported by the prosecutor and the demeanor observed by the trial court "*can* demonstrate a general 'hostility toward . . . the proceedings.' " (Italics added.) But they can also be unrelated: Juror No. 22's apparent discomfort with the subject matter of the case did not necessarily have anything to do with her dislike of both counsel, and the prosecutor identified only the latter, not the former, as a concern. Importantly, the prosecutor himself, after stating that the juror's demeanor indicated she didn't like either counsel, did not suggest the reason was that she had general hostility toward the proceedings. Rather, he said, "I couldn't figure out exactly why."

Consider how this demeanor-based reason would fare under the new legal framework enacted after Newson's second trial. (Code Civ. Proc., § 231.7.) The Legislature has declared that counsel's observation that a "prospective juror exhibited either a lack of rapport or problematic attitude, body language, or demeanor" has "historically been associated with improper discrimination in jury selection" and is "presumptively invalid" as a reason for exercising a peremptory strike "unless the trial court is able to confirm that the asserted behavior occurred, based on the court's own observations or the observations of counsel for the objecting party." (*Id.*, subd. (g)(1)(B), (2).) "Even with that confirmation, the counsel offering the reason

4

shall explain why the asserted demeanor, behavior, or manner in which the prospective juror answered questions matters to the case to be tried." (*Id.*, subd. (g)(2).) A trial court "shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge." (*Id.*, subd. (d)(1).) "The reviewing court shall consider only reasons actually given . . . and shall not speculate as to or consider reasons that were not given . . . ." (*Id.*, subd. (j).)

These standards were not met by the prosecutor, who gave a presumptively invalid demeanor-based reason; by the trial court, which did not confirm that the asserted behavior occurred based on its own or defense counsel's observations, and instead relied on its own, different observation of Juror No. 22's demeanor; or by the Court of Appeal, which speculated that the juror harbored general hostility to the proceedings when the prosecutor himself said "I couldn't figure out exactly why" the juror appeared to indicate dislike of both counsel.

Further, it bears noting that the reason offered by the trial court would fare no better than the prosecutor's demeanor concern under the new legal framework. The trial court said Juror No. 22 "looked uncomfortable" when asked "questions about white police officers, black individuals." Although the Court of Appeal characterized this discomfort as demonstrating hostility toward the proceedings, the new framework teaches that trial courts must be careful to probe such vague characterizations when evaluating whether "an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge. . . ." (Code Civ. Proc., § 231.7, subd. (d)(1).) Among other things, trial courts should consider "[w]hether a reason might be disproportionately

associated with a race. . . ." (*Id.*, subd. (d)(3)(E).) Perceived "discomfort" with questions about race — particularly questions about policing and race — may serve as a proxy for race. (*Id.*, subd. (e)(1) [peremptory challenge based on a prospective juror expressing "a distrust of or having a negative experience with law enforcement or the criminal legal system" is presumptively invalid]; see, e.g., *People v. Miles* (2020) 9 Cal.5th 513, 614 (dis. opn. of Liu, J.) [a prosecutorial practice of striking jurors based on their views of the O.J. Simpson case would result in disproportionate removal of Black jurors]; see also *People v. Flores* (2024) 15 Cal.5th 1032, 1055 (conc. opn. of Evans, J.) [noting generally the impact of racial disparities in policing].)

Turning to the prosecutor's second reason, the record indicates that Juror No. 22, when asked if she had ever been a party to a lawsuit, said, "I was on Judge Judy for not paying back a loan to my mom." The prosecutor mentioned the juror's appearance on Judge Judy as an indication that she might be "hard to work with" and "overly headstrong," and "could . . . hang a jury up and not listen to other people." But in describing this concern, the prosecutor said, "[S]he was on Judge Judy, and *she said she brought a case against her own mom regarding some type of loan*" (italics added), which is not true, before going on to say Juror No. 22 was "willing to bring [her] problems onto TV nationally over an issue, much less with [her] mother," which is true.

I agree with the Court of Appeal that the trial court was obliged to inquire further because Juror No. 22's other voir dire answers indicated she would work well with others, and especially because her employment as a premium customer service agent for a national airline seems inconsistent with the

characterization of her as an "overly headstrong" person who might be "hard to work with" and might "not listen to other people."

Moreover, I would not excuse the prosecutor's assertion that Juror No. 22 initiated the suit that led to her appearance on Judge Judy as a "seemingly sincere error." This assumes the answer to the very issue at the heart of the *Batson* inquiry: whether the prosecutor's stated reason was sincere or pretextual. Frankly, I tend to agree with the trial court that "[t]he Judge Judy thing, maybe, causes one to think, maybe, a little bit out of the mainstream" and "there might be something to that." But the prosecutor's misstatement — especially coming after his observation that a prior jury had hung 11 to 1 (the trial court attributed the holdout to a Black juror) — should have raised suspicion that the prosecutor viewed Juror No. 22 through a racialized lens and apparently heard what he wanted to hear in her voir dire testimony, even though contrary to the record. (See *Henderson v. Thompson* (Wn. 2022) 518 P.3d 1011, 1023 [counsel "characterized Henderson as 'combative' and 'confrontational.' These terms evoke the harmful stereotype of an 'angry BLACK woman.' "], citing Jones & Norwood, *Aggressive Encounters & White Fragility: Deconstructing the Trope of the Angry Black Woman* (2017) 102 Iowa L.Rev. 2017, 2049; Bannai, *Challenged X 3: The Stories of Women of Color Who Teach Legal Writing* (2014) 29 Berkeley J. Gender L. & Just. 275, 280 [quoting one professor as saying, "There's a bias against strong black women. There's a stereotype of the angry black woman, and media have perpetuated that stereotype. 'She's strong and better not cross her, difficult to get along with,' a 'my way or the highway' mentality, irrational . . . and impossible to control."].) Given

7

these circumstances, the prosecutor's second "reason is suspect," and "the trial court failed to ascertain adequately the credibility of this reason."

Thus, we are left with only the prosecutor's demeanor-based reason, and as explained above, I would not describe the trial court's "demeanor finding" as one of "near unassailability." Reasonable minds may differ on whether the credibility of one out of two stated reasons, under these circumstances, is sufficient to satisfy the standards in our case law. (See *People v. Smith* (2018) 4 Cal.5th 1134, 1157–1158.) But the larger point is that the entirety of the record and the circumstances here — including the prosecutor's statement of reasons, the trial court's ruling, and the Court of Appeal's opinion, though legally supportable — do not inspire great confidence that Juror No. 22 was in fact removed without regard to her race.

The Legislature has found that "the existing procedure for determining whether a peremptory challenge was exercised on the basis of a legally impermissible reason has failed to eliminate that discrimination" (Stats. 2020, ch. 318, § 1, subd. (b)), and it has "put into place an effective procedure for eliminating the unfair exclusion of potential jurors based on race" among other categories (*id.*, § 1, subd. (a)). In all likelihood, the issue here would have a different outcome if evaluated under the new standards, which again suggests "the Legislature may wish to consider whether to make the reforms of section 231.7 retroactive to cases pending on appeal." (*Nadey, supra,* __ Cal.5th at p. __ [2024 WL 3016945, at p. *57] (dis. opn. of Liu, J.); cf. Stats. 2022, ch. 739, § 1 [amending the California Racial Justice Act of 2020 to apply retroactively "to ensure justice for all"].)

Finally, despite the rejection of his equal protection claim, Newson may have an avenue for relief under the California Racial Justice Act of 2020 (RJA), which was designed to uproot racial bias in the criminal justice system and applies retroactively. (Stats. 2022, ch. 739; Stats. 2020, ch. 317, § 2, subd. (c) [observing that "the legal standards for preventing racial bias in jury selection are ineffective" and that " 'requiring a showing of purposeful discrimination sets a high standard that is difficult to prove in any context' "].) Proof of discrimination under the RJA does not require the showing of intent required under equal protection doctrine, and it is possible that Newson has a valid RJA claim in light of the totality of circumstances here.


**LIU, J.**

**I Concur:**

**EVANS, J.**